W. P. KENNEDY, as President of the Brotherhood of Railroad Trainmen, et al., Plaintiffs,

v.

The LONG ISLAND RAILROAD COM-PANY et al., Defendants.

United States District Court
S. D. New York.

Dec. 7, 1962.

Zelenko & Elkind, New York City (Arnold B. Elkind, New York City, of counsel), for plaintiffs.

Otto M. Buerger, Jamaica (Otto M. Buerger and James T. Gallagher, Jamaica, of counsel), for defendant Long Island R. Co.

Watters & Donovan, New York City (James B. Donovan and Thomas A. Harnett, New York City, of counsel).

Sidley Austin, Burgess & Smith, Chicago, Ill. (Kenneth F. Burgess, Doughlas F. Smith, Stuart S. Ball, Howard J. Trienens, Gary L. Cowan, Chicago, Ill., of counsel), for defendant railroads and Association of American Railroads.

RYAN, Chief Judge.

This suit for money damages has been filed by the Brotherhood of Railroad Trainmen (B.R.T.) and its officers against the Long Island Rail Road Company (Long Island), twenty-two other railroads, the Association of American Railroads (A.A.R.), and a bank. The damages are alleged to have arisen from a labor dispute which culminated in a strike called and conducted by the B.R.T. against the Long Island for some twenty-six days during July and August of 1960. The complaint alleges that the strike was the proximate result of strike insurance obtained by the defendants which is claimed to violate three federal statutes; the Railway Labor Act, the Interstate Commerce Act, and the Sherman Act; and to constitute a tortious act under New York law.

■ The first phase of this suit—that of liability—was tried to the Court on two depositions and an agreed statement of facts, which, together with annexed exhibits, was admitted as plaintiffs' Ex. 1. There was reserved for later jury trial the determination of consequential damage, if any, should the question of liability be determined in favor of plaintiffs.[1]

Plaintiffs have charged that sometime prior to July 13, 1959, the vice-president in charge of the law department of the A.A.R. met with designated representatives of the other railroad defendants to evolve an illegal and secret conspiracy whereby the defendant railroads and others represented in the A.A.R. could pool portions of their assets and earnings for the purpose of making a portion of gross earnings of all the alleged conspirators available from a pool to assist any participating conspirator which might be affected by a work stoppage,

---

1. The plaintiffs have objected to the relevancy of the stipulated items of fact and exhibits, specifically to evidence of the actual course of strike settlement negotiations between the Long Island and the plaintiffs. It is the plaintiffs' view that the actual course of negotiations is not relevant to the issue of whether or not participation in strike insurance was legal or illegal but that it may become relevant only on the issue of whether or not the damages which the plaintiffs sustained were brought about by the illegal conduct of the defendants. We overrule this objection.

thereby artificially strengthening the economic bargaining position of any individual conspirator in its collective bargaining activities with organized labor. Plaintiffs also allege that the purpose of said conspiracy was to promote and encourage lengthy work stoppages and lockouts in violation of the National Transporation Policy and in violation of the Railway Labor Act (45 U.S.C. §§ 151, 151a et seq.). Plaintiffs further charge that, as a further part of said conspiracy, the defendants agreed that the A.A.R. through its vice-president in charge of public relations, using illegally pooled earnings of the defendants, would embark upon an expensive and elaborate public relations program critical of the prevailing rules agreements between railway labor and the railroads, which program was designed to create a climate of public opinion which would accept a prolonged interruption in the rail transportation system in the United States whether by strike or lockout.

The only question presented for determination is whether as a matter of law membership in the railroad industry strike insurance plan here present violates any of the statutes and is unlawful as charged.

Plaintiffs argue that this "strike insurance plan" violates the Railway Labor Act's requirement of good faith bargaining in that participation in the plan is so destructive of the appropriate mental set for collective bargaining as to amount to an absence of good faith as a matter of law.[2] Plaintiffs also urge that this absence of good faith is further evidenced by the fact that participation in the plan by the Long Island introduced an element of multi-party bargaining into the Long Island dispute.

Plaintiffs continue in their reasoning that these duties imposed by Section 152 of the Act are rights legally enforceable under the Act by the carrier's employees by the filing of a civil suit to recover pecuniary damages as well as to obtain injunctive relief (Virginian Railway v. Federation, 300 U.S. 515, 57 S.Ct. 592, 81 L.Ed. 789), although admittedly the statute creates no such specific cause of action.

Defendants invoke the Clayton and Norris-LaGuardia Acts (29 U.S.C.A. §§ 52, 101 et seq.) as protecting the activities complained of and deny any violation of the Railway Labor Act.

### FACTS

The plaintiff B.R.T. is a labor organization representing approximately 200,000 employees of railroads throughout the country. As their bargaining agent, it authorizes and controls strikes by its membership and maintains "Strike and Protective Funds" to pay strike benefits to its members when it conducts a strike, or when its members are unemployed because of a strike called by other labor organizations.

Also named as plaintiffs are the two B.R.T. local lodges on the Long Island and the General Committee of the B.R.T.

2. "§ 152. (45 U.S.C.A.) General Duties—Duty of carriers and employees to settle disputes

"First. It shall be the duty of all carriers * * * and employees to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes, whether arising out of the application of such agreements or otherwise, in order to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof.

"Consideration of disputes by representatives

"Second. All disputes between a carrier or carriers and its or their employees shall be considered, and, if possible, decided, with all expedition, in conference between representatives designated and authorized so to confer, respectively, by the carrier or carriers and by the employees thereof interested in the dispute.

"Designation of disputes by representatives

"Third. Representatives, for the purposes of this chapter, shall be designated by the respective parties without interference, influence, or coercion by either party over the designation of representatives by the other * * *."

representing the Conductors, Ticket Collectors, Brakemen and Switchtenders employed by the Long Island as well as various officers of the B.R.T. The complaint alleges that these plaintiffs are suing in their own right and as representatives of classes of unnamed Long Island employees.

The defendants are the Association of American Railroads, the Long Island and twenty-two other railroads.[3] Each of the defendant railroads furnishes transportation by rail, as defined in the Interstate Commerce Act (49 U.S.C. § 1).

All defendant railroads are members of the A.A.R., an unincorporated association formed in 1934 to handle matters of common concern to the railroads, to represent the railroads before governmental bodies and to serve as a joint agency of the railroads in such matters as research, operations, traffic, accounting and finance. It maintains a Public Relations Department in charge of advertising and other activities in presenting information to the public, and a Law Department which handles legal matters of interest to the railroads.

Although not determinative of the legality of the strike insurance plan under attack, the background and events leading up to its adoption are certainly relevant to the purpose and intent of the defendants in adopting the strike insurance plan and its effect.

The strained financial condition of many of the American railroads for the past few years, and at present, is a matter of public knowledge and national concern.

It is conceded by all that return on investment of the average road attained the level of 4% only once in the six years (1954–1959) and dropped to 2.72% in 1959. The Long Island's earnings during this period were even lower; its rate of return in 1959 was only 0.72% and these meager earnings were realized by it only because it occupies a unique position as a railroad redevelopment corporation organized under special legislation of the State of New York. The principal business of the Long Island is carrying approximately 54 million commuter passengers annually, although it also carries some 20 million other passengers and 4½ million tons of freight annually.

In 1949, unable to meet its debts, it filed a petition in bankruptcy and was operated by Court-appointed trustees until 1954. A study of the Long Island by a public authority created by the New York legislature found that continuation of service by that road was essential in the public interest, and that its rehabili-

3. The defendant railroads are as follows:
The Atchison, Topeka & Santa Fe Railway Co.
The Atlantic Coast Line Railroad Co.
The Baltimore & Ohio Railroad Co.
Boston and Maine Railroad
The Central Railroad Company of New Jersey
The Chesapeake and Ohio Railway Co.
Chicago, Burlington & Quincy Railroad Co.
Chicago, Rock Island and Pacific Railroad Co.
The Delaware and Hudson Railroad Corp.
The Delaware, Lackawanna and Western Railroad Co.
The Denver and Rio Grande Western Railroad Co.
Erie Railroad
Great Northern Railway Co.
Lehigh Valley Railroad Co.
The Long Island Railroad Company
The New York, New Haven and Hartford Railroad Co.
The New York Central Railroad Co.
Northern Pacific Railway
The Pennsylvania Railroad Co.
Southern Pacific Co.
Southern Railway
Union Pacific Railroad
Wabash Railroad Co.
The action has been dismissed for want of jurisdiction or improper venue as to Grand Trunk Railway System, Chicago & Eastern Illinois Railroad, Chicago Great Western Railway, Chicago & North Western Railway Co., Illinois Central Railroad, Missouri-Kansas-Texas Railroad Co., Norfolk and Western Railway Co., Minneapolis, St. Paul & Sault Ste. Marie Railroad Co. and Imperial Insurance Company.
A severance was ordered as to plaintiffs' claim against Barclays Bank.

tation and continued service would be economically feasible only if payments of dividends and interest on indebtedness to its principal stockholder, the Pennsylvania Railroad, were suspended, its taxes reduced, and its passenger fares increased to cover its rising operating expenses plus the costs of a necessary program of rehabilitation. These provisions were incorporated into a plan of reorganization under which the Long Island qualified as a railroad redevelopment corporation under newly enacted state legislation.

Under this railroad redevelopment legislation, the fares of the Long Island are adjusted so as to cover its operating expenses, interest and other fixed charges and an amount necessary to finance a $65,613,000 rehabilitation program, at the rate of approximately $5 million per year. Approximately 67% of the total operating cost of the Long Island is made up of wages and benefits. Wages and benefits paid to employees represented by the B.R.T. increased 41%, from an average of $5641 per year per employee in 1954, to $7965 in 1959.

Obviously, the poor financial condition of many railroads was seriously and adversely affected by labor difficulties which the history of those years reveals were not few in number. The labor peace hoped for by enactment of the Railway Labor Act and by the efforts of the statutory Presidential Emergency Board were not fully realized.

Some strikes were conducted on a national level which, because of the economic and social results, brought into play Government action,[4] by way of seizure and injunction.

Beginning in 1950, apparently there was a shift from the national strike to the selective or the so-called "whipsaw"[5] strike against one or a few of the railroads.

In 1950, the Firemen conducted a strike against only the Santa Fe, the Southern and portions of the Pennsylvania and New York Central.

In 1950, the Switchmen conducted a strike against only five roads for 12 days and thereafter against the Rock Island alone until that road was seized by the Government. United States v. Switchmen's Union, 97 F.Supp. 97 (W.D.N.Y. 1950).

In 1951, the Firemen called a strike against the Baltimore & Ohio, Chicago & North Western, Louisville & Nashville and Terminal Railroad Association of St. Louis which was averted by the appointment of an Emergency Board. Thereafter, the Firemen, joined by the Engineers and the Conductors, conducted a strike against a portion of the New York Central and the Terminal Rail Road Association of St. Louis. After it had continued three days, this strike was ended by Government seizure and injunction.

The effectiveness of the selective strike lies partly in the fact that since all rail-

4. In 1941, a national strike set by the major railroad unions to enforce a position contrary to the recommendations of an Emergency Board was settled on the eve of the strike; in 1943 a national strike set by the railroad operating unions to enforce a position contrary to the recommendations of an Emergency Board was averted by Government seizure of the railroads; in 1946, the B.R.T. and the Engineers conducted a national strike to enforce a position contrary to the recommendations of an Emergency Board and against the Government, which had seized the railroads. After two days of complete interruption of railroad service and pending consideration of President Truman's proposal to draft the strikers into the Army, the strike was settled by granting wage increases in excess of those recommended by the Board; in 1948, a national strike of the Engineers, the Firemen and the Switchmen to enforce a position contrary to the recommendations of an Emergency Board was averted by Government seizure and an injunction obtained by the Government. United States v. Brotherhood of Locomotive Engineers, 79 F.Supp. 485 (D.C.D.C.1948).

5. " 'Whipsawing' is the process of striking one at a time the employer members of a multi-employer association." N. L. R. B. v. Truck Drivers Union, 353 U.S. 87, 90, 77 S.Ct. 643, 644, 1 L.Ed.2d 676 (1957).

roads have a highly interdependent wage structure, a successful strike resulting in a change in the wages of the employees of the struck railroad eventually works a change in the wages of operating employees of other railroads, aided, of course, as all strikes are, by the fact that the railroads are required, under the Railroad Unemployment Insurance Law, to provide benefits for the strikers from a fund contributed to solely by the railroads.[6]

It was in 1959 that action was taken on a national basis through the railroads' representatives as plaintiff states it "to strengthen their collective bargaining positions with the collective bargaining representatives of their employees" by subscribing to a strike insurance plan. In March of 1958, the A.A.R. Board of Directors had requested its Law Committee to devise some plan to put the railroads on a basis that would enable them to try to bring about settlements of these cases on the basis that the emergency boards have found to be fair, a step considered by them to be in the public interest and in the interest of the railroad management.

A draft plan was drawn up and circulated to the members of the A.A.R. Board of Directors; after revision, it took the present form. Counsel for the A.A.R. then met with members of the insurance brokerage firm of Hogg, Robinson & Capel-Cure, Ltd., in London, England, to negotiate for the writing of the proposed policy which the A.A.R. attorneys had prepared. Edward S. Hogg, member of the firm of Hogg, Robinson & Capel-Cure, Ltd., recommended that the policy be written by the Imperial Insurance Company, Ltd., a corporation newly formed on behalf of Hogg and his associates under the laws of the Bahama Islands.

On July 1, 1959, applications for policies of "Service Interruption Insurance" from Imperial were transmitted to the executives of the railroads, including the Long Island and other defendant railroads.

The Long Island thereafter submitted its application for a Service Interruption Policy, specifying a Daily Indemnity of $50,000 in response to question 3 of the application (infra), and upon the deposit of that amount in the designated bank, Barclays Bank D.C.O., Nassau, the policy was issued in Nassau. On August 17, 1959, the A.A.R. issued a press release to the newspapers announcing that the American railroads had overwhelmingly applied for Service Interruption Policies. In accordance with the terms of the policy, the insurance was issued by Imperial and became effective September 1, 1959 for all applicants, including the Long Island and other defendant railroads.

The provisions of each policy describing its operation and coverage are as follows:

"ARTICLE I. Subject to all the terms and conditions of this policy, the Company insures against loss, to the extent herein provided, directly resulting from a suspension of the Insured's operations, wheresoever conducted, caused by a work stoppage, as herein defined, commencing during the term of this policy.

"ARTICLE II. The maximum daily loss against which insurance is provided hereunder (herein called the 'Daily Indemnity') shall be the sum of $........ for the first year of this policy and for the second and third years the amount shall be as determined in accordance with the method prescribed in the application. In the event of a total suspension of Insured's operations by reason of a work stoppage, the Daily Indemnity shall be payable for each day of such total suspension (not exceeding 365 days of such a

---

6. Under the Act, $221,514.10 was paid to B.R.T. strikers and $721,500.43 to other employees who were out of work during the strike on the Long Island in July-August, 1960.

suspension caused by a single work stoppage). * * *

"ARTICLE III. Definitions— Whenever used in this policy without qualification the following terms shall have the meaning described below: * * *

"Work stoppage—The term 'work stoppage' shall mean a cessation of work by a part or all of the employees of the Insured for the purposes of enforcing demands made by one or more labor organizations on, or of resisting proposals of, a common carrier by railroad in instances (1) where such cessation of work (a) is contrary to the provisions of the Railway Labor Act or (b) is to enforce demands contrary to the recommendations of an Emergency Board appointed by the President of the United States, pursuant to the Railway Labor Act or (c) is in resistance to the application of recommendations of such an Emergency Board, or (2) where the demands or proposals (a) are directed to or may then or thereafter affect or (b) are made by, Insured Railroads representing more than 50% of the aggregate of Insured Railroads' Daily Indemnities and such an Emergency Board has not been appointed, or, if appointed, such Board has failed to make definite findings or recommendations on the merits thereof."

We are concerned here only with the first provision of Article III—(1) (a)—(c)—since there is no dispute but that the cessation came under 1(b). The "Daily Indemnity" referred to in Article II is calculated under a formula which covers the fixed costs, such as interest on debt and the expense of supervisory and other forces, which must be met daily in order to avoid bankruptcy during a strike. It does not cover loss of profits, loss of revenues necessary to carry out rehabilitation programs, or permanent losses in traffic diverted during a strike.

Each insured road pays a minimum premium each year and pays additional premiums in an amount equal to that proportion of the aggregate of Daily Indemnities payable to insured railroads on any given day which the insured's Daily Indemnity bears to the total of the Daily Indemnities of all insured roads that are liable for the payment of additional premiums for such day. Each insured railroad is required under the Policy to deposit in a designated Bank— Barclays Bank D.C.O.—the amount of its Daily Indemnity to secure the payment of premiums.

On August 25, 1960 interest was distributed by Barclays Bank in New York to all participants in the Service Interruption Policy. Imperial Insurance Company, Limited, is not required to, nor does it, maintain any reserves with which to pay claims for benefits under the Service Interruption Policy, except that additional premiums it receives under Article V [7] become a reserve for payment of appropriate claims. Holders of Service Interruption Policies pay minimum premiums yielding $150,000 per annum and this is the sole monetary benefit received by the defendant, Imperial Insurance Company, Limited, under the Policies; these minimum premiums are paid on a pro-rated basis by holders of Service Interruption Policies in proportion to the Daily Indemnities for which they applied.

On July 10, 1960, the Long Island gave notice of suspension of operations to the Imperial Insurance Company and to the Advisory Committee. The Committee, after investigation and report, determined that the strike on the Long Island was a cessation of work of the kind entitling it to receive Daily Indemnity. On July 14, 1960, the Advisory Committee sent a letter to Imperial advising that claims submitted by the Long Island were payable. The Advisory Committee computed the additional premi-

7. Plaintiffs' Exhibit 1.

ums that would be due under Article V of the policy and sent all policyholders a memorandum explaining how to calculate the premiums they would be called on to pay. On July 18, 1960, Imperial, having made the computation of additional premiums required by Article V (c) of the policy, mailed to each policyholder a bill for the additional premium due for the first four days of the strike. On receipt of these checks, Imperial sent to the Long Island at Jamaica, New York, a check in payment of its Daily Indemnity of $50,000 per day. As the strike continued, the Long Island gave additional notices of its claims, and they were paid by the same procedure used for its first claims.

The labor dispute which led to the strike on the Long Island in July and August of 1960 arose from a B.R.T. demand for a 5-day work week in short turnaround (commuter) service without any reduction in the pay received for a 6-day week.

An agreement dated April 5, 1957, between B.R.T. and most of the railroads, providing for a mortatorium on changes in wages and work rules was about to expire November 1, 1959, and for several months prior, the railroads, including the Long Island, and the B.R.T. had been negotiating on a national basis with respect to changes in the work rules. During the moratorium period and in 1958, the Long Island representative of the B.R.T. served on the Long Island a request for four rule changes. At the conclusion of the moratorium period in 1959, the same requests were again served along with eight other demands; the railroad countered with twelve rule changes.

The primary issue, however, was the five-day work rule. A conflict then developed over the right of the B.R.T.'s Long Island representative to bargain on behalf of the B.R.T. as to the other overlapping demands which necessitated national handling. While this question was unresolved, the B.R.T. called a strike against the Long Island for December, 1959; a postponement was obtained through the National Mediation Board and bargaining resumed. Efforts to reach a settlement proving fruitless, the National Mediation Board requested that the parties submit to arbitration. The Long Island consented; the B.R.T. refused and a new strike date of April 25, 1960 was set. On April 18, 1960, an Emergency Board was created by the President; the B.R.T. refused to cooperate with the Presidential fact finders and refused to accept the recommendation of the Board that they withdraw their demands. The B.R.T. set a new strike date of June 19, 1960; and refused to settle the dispute at the Long Island's suggestion on an even more favorable basis than the Board had suggested. On July 10, 1960, the B.R.T. began its strike against the Long Island resulting in a complete shutdown until August 3, 1960.

The B.R.T. rejected further recommendations of a New York State Board of Inquiry, which the Long Island had accepted but, finally, the strike was settled. Under this settlement, the B.R.T. obtained the 5-day week in short turnaround service at a net additional cost to the Long Island of $162,041 per year over and above the cost of the increased wages and other benefits received by the B.R.T. as a result of the national agreement which had become effective only six weeks before, on June 22, 1960.

During the period of the strike, the B.R.T. paid out a total of over $158,121 in strike benefits to which was added about $943,014 benefits paid out by railroad boards to the strikers and nonstrikers; a total of benefits amounting to $1,101,136; while the Long Island Railroad collected about $1,300,000 strike insurance.

Plaintiff's argument in support of its contention that the strike insurance plan is illegal *per se* proceeds as follows:

1. Defendant Long Island was operating at a deficit.
2. Under the strike insurance plan, it could collect up to $50,000 a day which was in excess of its operating expenses.

3. Therefore, it was more profitable for it to cease operation than to continue to operate.

4. Such a situation was, as a matter of law, incompatible with a bonafide effort to settle its dispute.

5. And resulted in a *per se* violation of the obligation imposed by the Railway Labor Act to bargain in good faith in an attempt to reach a settlement.

6. And in addition the Long Island was obligated to represent the interests of the other participating carriers in its bargaining.

7. All of which resulted in a further violation of the alleged duty imposed in the carrier not to bargain on an industry-wide basis without the Union's consent.

We put aside for the moment the erroneous statements and conclusions drawn by plaintiff to discuss at the outset the applicable law.

■ There is no provision in the Railway Labor Act outlawing or permitting strike insurance. This, however, is of no significance since the purpose of the Act is to set up procedures to avert interruption to commerce, not to prescribe or proscribe the labor activities of parties.[8] Terminal RR. Ass'n v. Brotherhood of Railroad Trainmen, 318 U.S. 1, 6, 63 S.Ct. 420, 87 L.Ed. 571. However, the Clayton and Norris-LaGuardia Acts do enumerate what are lawful activities and what are the respective duties of labor and employer and among these activities, they specifically enumerate: the obtaining and communicating of information and the paying of strike benefits to any person engaged in a labor dispute.[9]

Then, too, we have the recent holding of the Supreme Court that "there is simply no inconsistency between the application of economic pressure and good-faith collective bargaining"; even though the economic pressure applied is an activity unprotected by the Labor Management Relations Act (N. L. R. B. v. Insurance Agents, 361 U.S. 477, 494–495, 80 S.Ct. 419, 4 L.Ed.2d 454 (1960)).

While there the duty found not to have been violated was that imposed on the Union under Section 8(b) (3) of the Labor Management Relations Act (29 U.S. C.A. § 158(b) (3)) "to bargain collectively"; and here the duty charged to have been violated is that imposed on all parties to "exert every reasonable effort to make and maintain agreements" under the Railway Labor Act (45 U.S.C. § 152), the nature of the obligation is essentially identical: to bargain in good faith. The principle laid down—that the use of economic pressure is "part and parcel of the process of collective bargaining" (361 U.S. p. 495, 80 S.Ct. p. 430, supra) and no *per se* violation of that duty—is clearly applicable to a determination of whether there was any such violation here and bars any attempted differentiation because of the different statutes involved.

That there would be no *per se* violation by reason of the strike insurance

8. Thus, the Act provides for the services of a National Mediation Board, then for arbitration, then for a Presidential Emergency Board, all agencies concerned with helping the parties reach an agreement in order to avoid a national emergency by an interruption of commerce.

9. Under the Clayton Act, Section 20, 29 U.S.C. § 52, these activities include: (1) "peacefully obtaining or communicating information * * * paying or giving to, or withholding from, any person engaged in such dispute, any strike benefits or other moneys or things of value;

* * *." and under Sec. 4 of the Norris-LaGuardia Act (29 U.S.C. § 104):

"(c) Paying or giving to, or withholding from, any person participating or interested in such labor dispute, any strike or unemployment benefits or insurance, or other moneys or things of value; * * *

"(d) * * *

"(e) Giving publicity to the existence of, or the facts involved in, any labor dispute, whether by advertising, speaking, patrolling, or by any method not involving fraud or violence; * * *

"(h) Agreeing with other persons to do or not to do any of the acts heretofore specified; * * *".

benefits here paid, is all the more apparent when we realize that the holding in the Insurance Agents' case was in the face of conduct which the Court characterized as "disloyal tactics" designed to "harass" the employer and, unlike the conduct here, not protected by any labor statute.

Here, the so-called weapon used is one expressly protected by two statutes and one consistently employed by labor with no accusation of disloyal or harassing conduct.

Underlying the Court's rejection of any taint of illegality in the use of economic force was an explicit recognition of a positive benefit to be derived from the use of such weapon in reaching peaceful settlement and promoting the labor laws in general. If the sort of conduct there engaged in was held to strengthen the collective bargaining process by supposedly equalizing respective bargaining positions, how much more so does the availability of strike insurance, which may operate to prevent unreasonable demands being made upon one who might have to capitulate because of financial exigencies with no opportunity to bargain on an equal basis. It is this precise reason which has prompted unions to provide strike insurance funds and employers now to desire them. The recognition of the Court that economic pressure is "a prime motive power for agreements in free collective bargaining" (361 U.S. p. 477, 80 S.Ct. p. 419) dispels the argument that the result of such insurance flies in the face of the purpose of the Act "to provide for the prompt and orderly settlement of all disputes concerning rates of pay, rules, or working conditions."

That the insurance served to promote the purposes of the Railway Labor Act is further evidenced by the provision in the policy that benefits became payable only if the work stoppage was contrary to the provisions of the Railway Labor Act or to enforce demands contrary to or in resistance of the recommendations of a Presidential Emergency Board. This provision operates to encourage resort to the procedures of the Act and to make it less likely that the union will refuse to comply with the Board's recommendation and will refuse to accept the procedure set up by Congress to avert a strike.

Consistent with its contention that strike insurance constituted a *per se* violation, plaintiff has maintained throughout that evidence of the conduct of the parties in their negotiations is irrelevant to a decision on the legality of the insurance. But we hold this evidence to be highly relevant and we have considered it on the question of defendant's motive in subscribing to the insurance plan as well as on the effect of the plan itself. Indeed, it has been contended by plaintiff that the plan made it more profitable for defendant to cease operating than to attempt to adjust the demands of its employees.

The holding of the Supreme Court that economic duress does not exclude good faith bargaining as a matter of law rested upon a finding that the union accused of employing the economic force had and was negotiating with the employer at the time of the use of such duress. It appeared that these negotiations lasted over a period of six months before a new contract was reached and that, although economic retaliation was going on outside the conference rooms, it was part and parcel of the collective bargaining system.

Certainly, if defendant Long Island had refused to enter into any negotiations or to make any effort to meet with plaintiffs with a view to settling their differences, it would be in violation of its duty under the Act, irrespective of the availability of strike benefits. However, it does not follow that, because the "strike insurance" may have assisted the railroad in resisting the B.R.T. demands for a period while negotiations were being had, the entire strike insurance arrangements were unlawful.

The strike insurance plan was not a violation of defendant's duty to bargain in good faith; indeed, it might well be viewed as an attempt by the railroad to

follow the procedures of the Act in an effort to reach a peaceful settlement and to avert a strike.

It appears from the record that the Long Island made a series of counter-proposals to the union in the course of the bargaining; that it accepted the Mediation Board's proffer of arbitration; that it accepted the recommendations of the Presidential Emergency Board and then offered to settle on a basis more favorable to the union than the recommendations of the Board; that twice it accepted proposals by New York State authorities to submit the dispute to arbitration; and that it agreed to the proposal of the Governor of New York which granted the five-day week over and above the increased wages received by the B.R.T. as a part of the national wage scale, thus putting an end to the 26-day strike.

Plaintiffs have failed to establish that there was any violation of the carrier's duty to bargain in good faith under the first section of the Railway Labor Act.

■ Plaintiffs charge that defendant also violated the Railway Labor Act in that "by entering into the strike insurance plan, it introduced an element of multiparty bargaining without the consent of plaintiffs", thus violating the provision of Section 2 of the Act that the bargaining is to be between "parties to the dispute." This contention rests on the erroneous factual premise that the Long Island by receiving strike benefits to which other railroads had contributed was being financed to represent an industry-wide point of view and the interests of others instead of only its interests vis-a-vis plaintiffs; and on the additional erroneous legal premise that the Act forbids railroads to associate for the purpose of collective bargaining.

The insurance policy imposes no obligation on defendant requiring joint action or decision. In fact, it negates any such suggestions by specifically providing that "the insured shall be free at any time, without prejudice to this insurance, to make with the labor organization or organizations concerned an agreement

that results in a termination of such work stoppage." The Long Island's right to insurance payments in case of work stoppage covered by its policy was in no way dependent upon the popularity of the Long Island's bargaining position with other railroads.

The record shows that, at no time, was anyone but the Long Island conducting the bargaining through its own officers and for itself alone.

The counter offers made by the Long Island during the bargaining, its receptiveness to the recommendation of the Emergency Board, its willingness to submit the dispute with plaintiffs to arbitration, refute any contention that other roads controlled the Long Island in its bargaining under the Railway Labor Act.

No prohibition against organizing can be inferred from any provision in the Act and it is expressly provided that the term "representative" means "any person or persons, labor union, organization, or corporation designated either by a carrier or group of carriers or by its or their employees, to act for it or them." Section 151 (Sixth), 45 U.S.C.A. The only qualification imposed on the designation of a representative is that the representative be selected freely and independently by the group which he represents. Airlines Negotiating Conference Agreements, 8 CAB 354.

Because of the coordinate economic interests of the nation's railroads and their interdependence on one another, almost of necessity they have developed industry-wide wage and rule patterns and maintained a balance in the wage increases of the various employee groups within each railroad. Multicarrier bargaining of labor demands, referred to as regional and national handling, has been and is (since the Act) the customary method of collective bargaining. This has been recognized by the plaintiffs; its constitution empowers its national organization to carry on collective bargaining.

■ The most literal statutory violation upon which the plaintiff relies is the anti-pooling provision of the Inter-

state Commerce Act (49 U.S.C. § 5).[10] It is undisputed that there was no Interstate Commerce Commission approval of the insurance plan, and that the premiums paid by the Long Island to the Imperial Insurance Company came out of moneys collected from passenger fares and freight charges.

The strike insurance, plaintiff argues, has all the characteristics of an illegal pool in that it was a contract to divide a part of the earnings of the several participants (under the guise of premiums) with a resultant reduction of competition among them—"without attempting to obtain the specific approval of the ICC as required by the laws of the United States." (49 U.S.C. § 5(1).)

Plaintiff, however, recognizes that, while Section 5(1) empowers the Commission to exempt pools from the prohibition of the statute which it determines will not unduly restrain competition and will result in better service to the public or economy in operation, the broad sweep of the section does not encompass pools whose sole concern is labor-management relations.

The legislative history of this provision of the Interstate Commerce Act leaves no doubt that its purpose and need was to prohibit a well-defined type of anti-competitive arrangement, which had become widespread in the railroad industry. The evil had been found in arrangements between railroads to suspend competition by apportioning the business and dividing the pooled earnings in fixed percentages. That this was the purpose of the section is quite evident and has been noted in numerous decisions, both of the Courts and the Commission. (See United States v. Trans-Missouri Freight Assn., 166 U.S. 290, 17 S.Ct. 540, 41 L.Ed. 1007; Norfolk Southern Bus Corp. v. Virginia Dare Transp. Co., 4 Cir., 159 F.2d 306; Atlantic Greyhound Corp. Pooling, 37 M.C.C. 543.)

In short, Section 5(1) deals with arrangements between competing railroads to apportion business, and has no application to payments made for strike insurance. Such arrangements and activities have been held not to violate any law of the United States. (United States v. Hutcheson, 312 U.S. 219, 61 S.Ct. 463, 85 L.Ed. 788.)

Lastly, says plaintiff, the plan is a "pooling of resources" by competitors "for the purpose of supporting work stoppages"—illegal under the Anti-trust Acts which "are concerned with regulating monopolistic powers that come from combinations of economic ownership." The specific antitrust violation charged is an attempt by the railroad industry "to rig the price which it will pay for the essential ingredient of labor", in contravention of the Sherman Act. (15 U.S.C.A. § 1.) The answer to this is plaintiff's own quotation from the Clayton Act, 15 U.S.C. § 17, that, for purposes of the antitrust laws, "[t]he labor of a human being is not a commodity or article of commerce", and the express holding of the Supreme Court in Apex Hosiery v. Leader, 310 U.S. 469, 495, 60 S.Ct. 982, 84 L.Ed. 1311, that INTERRUPTION of commerce arising out of a bonafide labor dispute does not come within the Sherman Act. (See also

10. "§ 5. Combinations and consolidations of carriers

"Pooling; division of traffic, service, or earnings

"(1) Except upon specific approval by order of the Commission as in this section provided, and except as provided in paragraph (16) of section 1 of this title, it shall be unlawful for any common carrier subject to this chapter, chapter 8, or chapter 12 of this title to enter into any contract, agreement, or combination with any other such common carrier or carriers for the pooling or division of traffic, or of service, or of gross or net earnings, or of any portion thereof; * * *".

And for a violation of this provision, the statute (Section 8) provides that:

"such common carrier shall be liable to the person or persons injured thereby for the full amount of damages sustained in consequence of any such violation of the provisions of this chapter, together with a reasonable counsel or attorney's fee, to be fixed by the court in every case of recovery, * * *".

Schatte v. International Alliance, 9 Cir., 182 F.2d 158.)

None of the activities attacked by plaintiff, including the strike insurance program and the public relations activities of defendants, did place, or could place, any restriction on commercial competition in the market for any goods or services. Eastern R.R. Pres. Conf. v. Noerr Motor, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464. The *sine qua non* of the condemnation of the Sherman Act "restraint on commercial competition" is totally lacking in the case.

At the outset and solely for purposes of the discussion of the legal questions raised by plaintiff, we assume without contradiction that the activities charged against defendants were as characterized by plaintiff. Because these characterizations and interpretation of the policies have formed the basis of its charges of illegality, we make the following findings and comments.

The insurance is said by plaintiff not to be the usual type of insurance which spreads and cushions economic loss "because of events that are without the control of the insured" but is in form one which is against public policy in that benefits "can be turned on or off at the will and judgment of the insured." A reading of the policy and the actual operation of the plan with respect to the Long Island is sufficient to demonstrate that plaintiff's interpretation is without support in fact. The benefits were paid to the Long Island because of events without its control—"a cessation of work by the employees of the insured to enforce demands contrary to the recommendations of an Emergency Board appointed by the President of the United States, pursuant to the Railway Labor Act."

Plaintiff further states that the legal relationship created was not that of an insurance company with several insured carriers and that a railroad's payment to Imperial was not a true insurance premium because it was not a fixed consideration in return for the assumption of each carrier's risk of loss due to strikes.

The plan presents a form of mutual insurance conditioned upon the taking of similar policies by a stated percentage of the insured class, and payment of premiums corresponding with the losses suffered by the members of the insured class. The members in effect insure one another. Under this form of insurance, the risk is transferred to all the members of the class so that upon the happening of the contingency insured against to one of the members of the class, the individual financial loss is distributed over the whole class. The loss is not eliminated as plaintiff argues, but rather it is redistributed among the class from whom must then be collected an aggregate sum equal to the total of the losses and expenses. The sum is collected by way of assessment on each member in proportion to the amount of their policies. Naturally, if the relationship continues for any length of time, the one whose loss has been redistributed pays back all he has received and the expense attributable to his indemnification since, when the next contingency occurs to another, he is assessed.

No temptation to cause loss is held out by the payment of the daily indemnity since all that this payment covers is fixed costs which must be met daily in order to avoid insolvency. This daily indemnity payment, as we have mentioned, does not cover loss of profits, loss of extra revenues for rehabilitation and improvement, or loss of traffic.

The Long Island Railroad, as a Redevelopment Corporation, operated under a plan which provided for revenues for rehabilitation as well as for its operating expenses. Therefore the strike—forgetting for the moment the fact that the Long Island would be assessed to cover the next loss befalling another of the carrier members by reason of a strike—was "far from economically advantageous" since the Long Island lost revenues necessary to its rehabilitation; plus diversion of passenger and particularly freight traffic which to an extent it could never hope to recoup. Finally, the daily indemnity received covered only

the "daily" expenses incurred by a railroad under conditions of total suspension of operation with no additional allowance to put the property in condition as to effect resumption of services at the end of the strike stoppage.

From the tortured and strained construction given by plaintiff to the insurance policy in suit, the statutes relied on and the conclusions attempted to be drawn from plaintiff's interpretation, the real complaint emerges (described in plaintiff's own words): that the railroads have attempted to eliminate "the inevitable financial loss involved in a work stoppage", and that this adversely affected plaintiff's economic position in its efforts to secure its demands from the industry.

The strike insurance plan offends none of the statutes cited; it is found to be lawful and the complaint is dismissed with costs. Let judgment be so entered forthwith by the Clerk.