**UNITED TRANSPORTATION UNION,**
**Plaintiff,**

v.

**BURLINGTON NORTHERN, INC., et al.,**
**Defendants.**

**Civ. A. No. 2183–70.**

United States District Court,
District of Columbia.

March 18, 1971.

———◆———

Joseph L. Rauh, Jr., John Silard and Isaac N. Groner, Washington, D. C., for plaintiff.

Francis M. Shea, Richard T. Conway, Washington, D. C., for defendants.

### MEMORANDUM OPINION

PARKER, District Judge.

This action, arising under the Railway Labor Act,[1] (hereafter the RLA or the Act), and brought by the United Transportation Union, (hereafter the UTU or the Union) against the major rail carriers of the nation, presents to the Court another chapter of a longstanding dispute dealing with the requirements for manning freight and yard diesel locomotives with firemen. The Union seeks a declaratory judgment that once all bargaining procedures provided under the Act have been exhausted, it has the right to strike the railroads individually and selectively and is not restricted to a nationwide strike against all the carriers. The carriers have filed a counterclaim contending that there having been so-called national handling of the fireman manning dispute, any strike by the Union against fewer than all of the carriers involved in such group bargaining violates the Act.

The carriers request the Court to declare the selective strike unlawful and

---

to grant injunctive relief against the Union's proposed course of conduct. At this posture of the proceedings, the Court considers the Union's motion for summary judgment and the motion of the carriers for a preliminary injunction.

For the reasons set forth, the Court concludes that the motion of the plaintiff Union for summary judgment should be granted and the motion of the defendant carriers for a preliminary injunction should be denied.

The underlying problem was recently described in a report of a special panel appointed by President Nixon pursuant to the provisions of the Act.[2]

"The fireman manning issue is the Nation's longest extant labor dispute. And it is also the most studied, reviewed and volatile issue on the American Labor scene. Despite the intensive efforts of a veritable who's who of distinguished labor experts, the parties have failed to agree upon a solution. The dispute has been punctuated by recurrent national crises arising from actual and threatened nation-wide rail stoppages."

The dispute arises out of the continued use of firemen who were employed originally on steam locomotives. The carriers seek complete discretion as to the employment of these firemen on yard and freight diesel locomotives and thus to eliminate those whom they, in their own discretion, deem unnecessary. On the other hand, the Union seeks to restore positions previously eliminated, as well as to maintain existing fireman positions. The Union claims that "firemen are essential to rail operations for reasons of (1) safety, (2) avoidance of undue work burdens, (3) efficiency of operations and (4) providing a pool of trained men for promotion to engineer."[3]

The events of this particular chapter of the controversy began in 1963. At that time the Congress, confronted by a nation-wide railroad strike, responded by enacting unprecedented legislation providing for compulsory arbitration of the issue.[4] In accordance with the statute, Arbitration Board 282, composed of representatives of labor, management and the public, was created. The Board rendered an award which was operative for a two year period, expiring on March 31, 1966.

The Board's award, sustained by the Courts against a union challenge,[5] gave authority to the carriers to eliminate certain fireman positions, set forth a procedure for the gradual elimination of the affected employees, and provided for separation benefits.

In November, 1965, prior to the expiration of the award, the Brotherhood of Locomotive Firemen and Enginemen (hereafter the BLF & E) pursuant to the Act[6] served certain bargaining notices on the carriers, requesting changes in the existing contract requirements governing the manning of freight and yard diesel locomotives with firemen, as modified by the award of Arbitration Board No. 282. In January, 1966, the defendant carriers served counter-notices on the BLF & E seeking the unrestricted right to determine when firemen should be used on diesel freight and yard service locomotives. While several conferences were held between the parties, the carriers contended that the Union's notices were premature, and they refused to engage in negotiations. The BLF & E argued that after expiration

2. Report to the President of Emergency Board No. 177, August 6, 1970, p. 1. The Board was appointed on July 7, 1970, pursuant to 45 U.S.C. § 160.

3. *Id.*, at 5.

4. Pub.L. No. 88–108, 77 Stat. 132, Aug. 28, 1963.

5. Brotherhood of Locomotive Firemen and Enginemen v. Chicago, Burlington and Quincy Railroad Co., 225 F.Supp. 11 (D.D.C.1964), affirmed 118 U.S.App.D.C. 100, 331 F.2d 1020, cert. denied 377 U.S. 918, 84 S.Ct. 1181, 12 L.Ed.2d 187 (1964).

6. 45 U.S.C. § 156.

of the award the operative work rules were those in effect when the Arbitration Board was created. Our Circuit Court resolved the questions by ruling that the issues presented by the Union's notices were proper and that the carriers were obliged to confer and bargain under the Railway Labor Act even though the period of the award had not expired. Further, the Court held that the carriers could no longer eliminate jobs under the terms of the award once it had expired; that the results of the award remained effective until changed in accordance with the procedures of the RLA; and that the BLF & E could not strike until those procedures were exhausted. Brotherhood of Railroad Trainmen v. Akron and Barberton Belt Railroad Co., 128 U.S.App.D.C. 59, 385 F.2d 581 (1967), as amended 1968, cert. denied 390 U.S. 923, 88 S.Ct. 851, 19 L.Ed.2d 983 (1968).

In mid-1968 the parties invoked the services of the National Mediation Board as provided under the Act.[7] Several rounds of negotiation proved unsuccessful and on November 4, 1969, after advising the parties of failure in its mediation efforts, the Board terminated its services. In accordance with the Act, the parties were then free to resort to self-help on December 5, 1969. However, negotiations were resumed in early 1970 with the assistance of a special mediator appointed by the Secretary of Labor. These negotiations were equally unsuccessful and the efforts of the special mediator were terminated.

On July 7, 1970, the UTU[8] invoked its right of self-help under the Act on its 1965 bargaining notices and struck four carriers. On that same day the carriers applied for and were granted a temporary restraining order by this Court.[9] The carriers challenged the legality of any selective strike by the Union. Shortly after the issuance of the temporary restraining order, and pursuant to the provisions of the Railway Labor Act, President Nixon created an emergency board to investigate and report concerning the dispute.[10] This action precluded both parties from recourse to self-help for sixty days. Following the presidential action the temporary restraining order was vacated as moot and the carriers withdrew their complaint.

On July 22, 1970, prior to the expiration of the services of Emergency Board 177, the Union filed this action for a declaration that, upon exhaustion of all procedures under the Railway Labor Act, its right to self-help is not restricted to a nationwide strike against all the carriers, but rather it is entitled to strike one or more of the carriers.

Although the Emergency Board made recommendations in its Report to the President on August 6, 1970, the parties were unable to conclude a complete and final agreement. However, negotiations continued by agreement between the Union and the carriers, as well as with the encouragement of this Court. When the matter came before the Court on the Union's motion for summary judgment and the carriers' motion for a preliminary injunction, representations were again made that negotiations would continue. The Union however emphasized that all negotiations subsequent to the report of the Emergency Board were without prejudice to its claimed right of self-help against individual carriers.

At the outset the carriers contend that the action by the Union seeking relief is premature because bargaining and negotiations continue and the possibility of reaching an agreement has not been completely lost and thus no true impasse is present.

---

7. 45 U.S.C. § 155 First.

8. The Brotherhood of Locomotive Firemen and Enginemen and three other unions, merged on January 1, 1969, to form the United Transportation Union.

9. Burlington Northern, Inc., et al. v. United Transportation Union, Civil Action No. 2026–70, (filed July 7, 1970).

10. See footnote 2, *supra*.

The procedures for resolving a major dispute under the Act were recently and succinctly outlined by the Supreme Court:

"* * * A party desiring to effect a change of rates of pay, rules, or working conditions must give advance written notice. § 6. The parties must confer, § 2 Second, and if conference fails to resolve the dispute, either or both may invoke the services of the National Mediation Board, which may also proffer its services *sua sponte* if it finds a labor emergency to exist. § 5 First. If mediation fails, the Board must endeavor to induce the parties to submit the controversy to binding arbitration, which can take place, however, only if both consent. §§ 5 First, 7. If arbitration is rejected and the dispute threatens 'substantially to interrupt interstate commerce to a degree such as to deprive any section of the country of essential transportation service, the Mediation Board shall notify the President,' who may create an emergency board to investigate and report on the dispute. § 10. While the dispute is working its way through these stages, neither party may unilaterally alter the *status quo*. §§ 2 Seventh, 5 First, 6, 10." Brotherhood of Railroad Trainmen et al. v. Jacksonville Terminal Co., 394 U.S. 369, 378, 89 S.Ct. 1109, 1115, 22 L.Ed.2d 344 (1969).

This current phase of negotiations on the fireman manning issue extends over a five year period. There have been endless and protracted bargaining conferences. The services of the National Mediation Board have been utilized. Arbitration has been rejected by the Union. Presidential action further delaying a strike has been taken. Services of special mediators have been employed. All of these efforts undertaken within the framework of the Railway Labor Act have nevertheless proved unavailing to secure a mutually satisfactory agreement.

The Court, therefore, finds from this record that all statutory procedures have been exhausted. A strike is now imminent and the Union has declared its intention to move on a selective basis. It seeks a ruling from this Court at the point when all statutory requirements have been expended. The carriers' motion for a preliminary injunction as well as their counsel's suggestion at oral argument that the Court could grant relief on their behalf by way of summary judgment appear to be veiled recognition of the futility of the bargaining process at this point.

But has the Union in its various stages of negotiations bargained in good faith and thus exhausted the statutory remedies in fact as well as within the framework of the statutory requirements?

In Virginian Railway Co. v. System Federation, etc., 300 U.S. 515, 57 S.Ct. 592, 81 L.Ed. 789 (1937) Justice Stone commented on this duty under the Railway Labor Act as follows:

"* * * The statute does not undertake to compel agreement between the employer and employees, but it does command those preliminary ·steps without which no agreement can be reached. It at least requires the employer to meet and confer with the authorized representatives of its employees, * * *, to enter into a negotiation for the settlement of labor disputes such as is contemplated by section 2, First." at 548, 57 S.Ct. at 599. Also, N.L.R.B. v. Insurance Agents' International Union, A.F.L.–C.I.O., 361 U.S. 477, 485, 80 S.Ct. 419, 4 L.Ed.2d 454 (1960).

In Atlantic Coast Line Railroad Co. et al. v. Brotherhood of Railroad Trainmen, 262 F.Supp. 177, 183 (D.D.C. 1967), affirmed in part and reversed in part, sub nom. Brotherhood of Railroad Trainmen v. Atlantic Coast Line Railroad Company, et al., 127 U.S.App.D.C. 298, 383 F.2d 225 (1967), cert. denied 389 U.S. 1047, 88 S.Ct. 790, 19 L.Ed.2d 839 (1968), Judge Holtzoff stated that good faith bargaining suggests

"  *   *   * an obligation to negotiate genuinely and sincerely with the aim of amicably settling the differences between the parties and concluding an agreement. It is not sufficient to appear at a conference or a meeting with the other party and to submit an offer, or to make a demand, and yet to decline to argue its merits, or to refuse to entertain or discuss a counter-proposal. It is not a genuine negotiation to indicate that the other party has no choice except to accept the offer or accede to the demand. The service of an ultimatum does not constitute a negotiation."

But, as our Court of Appeals has noted,

"The procedures of the Act are purposefully long and drawn out to afford the maximum inducement to peaceful settlement, but the Act does not require efforts clearly at war with reality." Brotherhood of Railroad Trainmen v. Atlantic Coast Line Railroad Company et al., 127 U.S. App.D.C. 298, 302, 383 F.2d 225, 229 (1967), cert. denied 389 U.S. 1047, 88 S.Ct. 790, 19 L.Ed.2d 839 (1968).

Upon a review of the entire record in this proceeding within the framework of the relevant case law, the Court finds no facts presented upon which it could conclude or infer that the Union has not bargained in good faith. In fact, it is the carriers who arguably have a vested interest in further delay since the results of Arbitration Award 282 remain in effect until changed by contract or in accordance with statutory procedures. Brotherhood of Railroad Trainmen v. Akron & Barberton Belt Railroad Co., *supra*.[11]

The carriers' thesis that previous national handling of labor disputes precludes the Union's resort to selective strikes finds no support in either the history of labor-management disputes in the railroad industry, the RLA, or appellate case law.[12] During the past twenty years the predecessor union, the BLF & E, and other railroad operating unions have on numerous occasions exercised the right to individual and selective strikes even though the basic dispute giving rise to the strike had been and was at the time the subject of national handling.

In early 1950, the identical issue underlying this proceeding, the extent to which diesel locomotives should be manned with firemen, gave rise to a selective strike by the BLF & E. At that time, the procedures of the Act had been exhausted through national handling by the parties without success. That union, then representing the firemen, resorted to a strike against only eight of the nation's carriers participating in negotiations.[13] This strike led to the enactment of the National Diesel Agreement of May 17, 1950.

Likewise in 1952, the BLF & E, in concert with the Brotherhood of Locomotive Engineers and the Order of Railway Conductors resorted to a selective strike against several carriers.[14] The matters involved—wages and rules —were and had been subject to national handling. However, the unions saw fit to strike only a few of the carriers involved.

A similar strategy has been employed by railroad unions other than the BLF & E. In 1950 the Switchmen's Union of North America, later becoming a member of the UTU, struck five rail-

---

11. At the expiration of the Award, on March 31, 1966, 18,000 firemen's jobs, approximately 60 percent of those subject to the jurisdiction of the Award, had been eliminated.

12. After careful consideration this Court is unable to agree with the relevant conclusions reached in Alton & Southern Railway Company et al. v. International Association of Machinists and Aerospace Workers et al., 310 F.Supp. 905 (D.D.C. 1970), appeal pending No. 24217 (U.S. App.D.C.).

13. Sixteenth Annual Report of the National Mediation Board, p. 5 (1950).

14. Eighteenth Annual Report of the National Mediation Board, pps. 6–8 (1952).

roads on the matter of the 40-hour work week.[15] There too, immediately prior to the strike, the matter had been the subject of national handling.

And, in 1955 unions representing certain non-operating railroad employees called a strike against a group of Southeastern carriers (the Louisville and Nashville Railroad System) on matters then in national handling.[16] Involved in the national handling of negotiations were three carrier associations—the Eastern and Western Carriers' Conference Committees and the Southeastern Carriers' Conference Committee. The carriers affiliated with the Eastern and Western Committees executed a collective bargaining agreement with the unions. But the Southeastern Carriers refused to ratify the agreement executed by the other carriers. The unions then struck against the Louisville and Nashville System, part of the Southeastern Conference. That strike is also of importance since it demonstrates that on at least one occasion the carriers themselves have taken selective action on matters in national handling.

Finally, the Court notes that only several years ago the carriers, by implication, recognized selective strikes as a legitimate and legal union weapon upon exhaustion of statutory procedural requirements. Kennedy et al. v. Long Island Rail Road Company, et al., 211 F.Supp. 478 (S.D.N.Y.1962), aff'd 319 F.2d 366 (2nd Cir. 1963), cert. denied 375 U.S. 830, 84 S.Ct. 75, 11 L.Ed.2d 61 (1963). There, as a direct response to the union's strike against a single railroad, the Long Island, the carriers created an insurance plan designed to protect their group. No contention was made by the carriers that the selective strike against Long Island was illegal, but rather they defended the insurance plan as a necessary responsive weapon to the union's action.

The Union's position also finds irrefutable support in recent Supreme Court decisions. In Brotherhood of Railroad Trainmen et al. v. Jacksonville Terminal Co., *supra*, the Court emphasized

"Nowhere does the text of the Railway Labor Act specify what is to take place once these procedures have been exhausted without yielding resolution of the dispute. Implicit in the statutory scheme, however, is the ultimate right of the disputants to resort to self-help—'the inevitable alternative in a statutory scheme which deliberately denies the final power to compel arbitration.' * * * We have consistently so held in a long line of decisions. * * * " 394 U.S. at 378, 89 S.Ct. at 1115 (citations omitted).

As recent history demonstrates, support of the position of the carriers would inevitably result in a choice between never striking or precipitating a national emergency and an imposed settlement,[17] thus depriving the employees of their implicitly guaranteed and most effective economic tactic—the right to strike.

The RLA makes no provision for compulsory arbitration of major disputes.[18] And the Supreme Court has admonished against

" * * * functioning as an arbiter of the sort of economic weapons the parties can use in seeking to gain acceptance of their bargaining demands * * * [by entering into] the substantive aspects of the bargaining process to an extent Congress has not countenanced." N.L.R.B. v. Insurance Agents' International Union,

15. Sixteenth Annual Report of the National Mediation Board, pps. 11–13 (1950).

16. Twenty-First Annual Report of the National Mediation Board, pps. 5–7 (1955).

17. See: Act of August 28, 1963, Pub.L. No. 88–108, 77 Stat. 132. Also, Act of July 17, 1967, Pub.L. No. 90–54, 81 Stat. 122; Act of April 9, 1970, Pub.L. No. 91–226, 84 Stat. 118.

18. See 45 U.S.C. §§ 157, 158 and 159.

A.F.L.–C.I.O., *supra*, 361 U.S. at 497, 498, 80 S.Ct. at 431, 432. See also N.L. R.B. v. Drivers, Chauffeurs, Helpers, Local Union No. 639, Int'l Bro. of Teamsters, etc. of America, 362 U.S. 274, 281–284, 80 S.Ct. 706, 4 L.Ed.2d 710 (1960); N.L.R.B. v. Erie Resistor Corp. et al., 373 U.S. 221, 234, 83 S.Ct. 1139, 10 L.Ed.2d 308 (1963).

There is no authority for this Court to concern itself with what "economic sanctions might be permitted negotiating parties in an 'ideal' or 'balanced' state of collective bargaining." N.L. R.B. v. Insurance Agents' Int'l Union, *supra*, 361 U.S. at 500, 80 S.Ct. at 433. " * * * [T]here is simply no inconsistency between the application of economic pressure and good-faith collective bargaining." *Id.*, at 494, 495, 80 S.Ct. at 430.

■ The Court concludes that national handling of the fireman manning dispute is obligatory in negotiations because of the "practical appropriateness of mass bargaining" and the "historical experience" in these circumstances.[19] Considerations of safety and training for future locomotive engineers are uniquely appropriate for general national standards. And negotiations

and past agreements concerning the fireman manning dispute indicate a clear acceptance by the parties of national handling.[20] But once the statutory procedures have been exhausted in good faith without agreement negotiations have legally reached an impasse. Selective strike action then becomes a legitimate economic tool so long as the Union continues to seek a national agreement by applying economic pressure on the carriers without seeking to coerce individual carriers into deserting the multi-employer bargaining unit and settling on an individual basis.[21] See American Shipbuilding Co. v. N.L.R.B., 380 U.S. 300, 85 S.Ct. 955, 13 L.Ed.2d 855 (1965); Morand Bros. Beverage Co. v. N.L.R.B., 190 F.2d 576, 581–582 (7th Cir. 1951).[22]

Despite the immediate public interest and pressure for a resolution of the fireman manning dispute, support of the position of the carriers would encourage nationwide strikes[23] and read a new chapter into the provisions of the Railway Labor Act in disregard of the express mandate of Congress.

Counsel for the plaintiff will submit an appropriate order within five days.

19. Brotherhood of Railroad Trainmen v. Atlantic Coast Line Railroad Co., *supra.* There the issue was whether a union is required to continue *negotiating* on a national handling basis once such a course had been undertaken. The issue of striking once negotiations had reached a statutory impasse was not considered. See also, Chicago, Burlington & Quincy Railroad v. Railway Employes' Department, A.F.L.–C.I.O., 301 F.Supp. 603 (D.D.C. 1969).

20. See especially: 1950 National Diesel Agreement; the chronology of the dispute, Report of Emergency Board No. 177, Appendix B., *supra;* and Supplementary Affidavit of Jess L. Shattuck, attached to Reply Memorandum for plaintiff, filed in this proceeding December 10, 1970, par. 7, p. 3.

21. The Court does not decide whether selective strikes are so limited when national handling is not obligatory. And since this is a declaratory action, the Court merely prescribes what is permissible in the future. Whether previous actions failed to conform with this Memorandum Opinion need not be examined.

22. The cases cited by the carriers, particularly at page 20 of their supplemental memorandum of points and authorities in opposition to the plaintiff's motion for summary judgment, filed September 21, 1970, all support the position that a whipsaw strike under the National Labor Relations Act is prohibited only when its purpose is to compel individual employers to withdraw from an existing multi-employer bargaining unit.

23. Criticisms of the RLA have been directed at the delays in reaching agreement rather than the Act's rather successful record in preventing national strikes. D. Cullen, National Emergency Strikes (1968), n. 11 at 69; L. H. Silberman, National Emergency Disputes—The Considerations Behind A Legislative Proposal, 4 Georgia L.Rev. 673, 676 (1970).

## JUDGMENT AND ORDER

This suit, brought under the Railway Labor Act by the United Transportation Union (UTU) against the major rail carriers of the nation, presents the question whether once a union proposal upon which national handling is obligatory has progressed through all the statutory bargaining and mediation procedures in good faith without agreement being reached, the union may strike fewer than all the carriers involved in the negotiations. The UTU's complaint seeks a declaratory judgment that once all bargaining procedures provided under the Act have been exhausted, it has the right to strike the railroads individually and selectively and is not restricted to a nationwide strike against all the carriers. The carriers filed a counterclaim contending that there having been national handling of the fireman manning dispute, any strike by the UTU against fewer than all of the carriers involved in such group bargaining violates the Act. The carriers also request injunctive relief against the UTU's proposed selective strike action.

Upon the UTU's motion for summary judgment and the defendants' motion for preliminary injunction, the Court has received voluminous briefs, affidavits and exhibits and heard full arguments from the parties. These include the "Statement of Material Facts As to Which Plaintiff Contends There Is No Genuine Issue"; the August 5, 1970 affidavit of Jess L. Shattuck with exhibits; defendants' answer to the Complaint; legal memoranda of the parties; the affidavit of John P. Hiltz, Jr. of July 7, 1970; the affidavit of Richard T. Conway of August 21, 1970; defendants' Statement of Genuine Issues Presented, the Supplemental Affidavit of John P. Hiltz, Jr. of September 21, 1970; the Supplemental Affidavit of Jess L. Shattuck filed December 10, 1970; and the Second Supplemental Affidavit of John P. Hiltz, Jr. of December 10, 1970.

On the basis of all of the foregoing, and of the Memorandum Opinion heretofore issued by this Court on March 8, 1971,

It is hereby ordered, declared and adjudged as follows:

1. That national handling of the fireman manning issue in dispute between the plaintiff and defendants is obligatory in negotiations under the Railway Labor Act (45 U.S.C. § 151 *et seq.*) because of the practical appropriateness of mass bargaining and the historical experience in the handling of this dispute.

2. That under the Railway Labor Act once the statutory procedures have been exhausted in good faith without agreement being reached upon a union bargaining notice whose national handling is obligatory and negotiations are thus legally at an impasse, a selective strike action then becomes a legitimate economic tool which the union can exert against the carriers involved in the national handling negotiations so long as the union continues to seek a national agreement by applying economic pressure on the carriers without seeking to coerce individual carriers into disrupting the multi-employer bargaining unit and settling on an individual basis.

3. That with respect to the "Notice No. 1" served in November, 1965 on the nation's railroads by the Brotherhood of Locomotive Firemen and Enginemen (BLF & E), since merged into plaintiff United Transportation Union, requesting changes in existing requirements concerning the manning of freight and yard diesel locomotives with firemen, there are no grounds presented for questioning that the BLF & E and the UTU have bargained in good faith on a national basis upon that notice and all of the statutory procedures have in fact been exhausted without reaching agreement. Accordingly, the United Transportation Union is now free and has the right under the Railway Labor Act to strike carriers individually and selectively and is not restricted to a strike against all of the carriers; provided, however, that the purpose of such a strike is to seek a national agreement

rather than abandonment of the multi-employer bargaining unit and individual settlement.

4. That the motion of the plaintiff for summary judgment is hereby granted; and the defendants' motion for preliminary injunction and their counterclaim are hereby denied.

5. That plaintiff may have its costs in this action.