**W. P. KENNEDY, as President of the Brotherhood of Railroad Trainmen, etc., et al., Plaintiffs-Appellants,**

**v.**

**The LONG ISLAND RAIL ROAD COMPANY, etc., et al., Defendants-Appellees.**

**No. 322, Docket 27989.**

United States Court of Appeals
Second Circuit.

Argued May 6, 1963.

Decided June 14, 1963.

---

Arnold B. Elkind (of Zelenko & Elkind), New York City, for plaintiffs-appellants.

Otto M. Buerger and James T. Gallagher, Jamaica, N. Y., for defendant-appellee Long Island R. Co.

James B. Donovan and Gerald E. Bodell (of Watters & Donovan), New York City (Howard J. Trienens, Kenneth F. Burgess, Douglas F. Smith, Stuart S. Ball and Gary L. Cowan (of Sidley,

Austin, Burgess & Smith), Chicago, Ill., of counsel), for defendant-appellee Railroads and Association of American Railroads.

Paul G. Reilly, New York City, Clarence M. Mulholland, Toledo, Ohio, Edward J. Hickey, Jr., James L. Highsaw, Jr., Washington, D. C., Reilly & Curry, New York City, Mulholland, Robie & Hickey, Washington, D. C., of counsel, for Railway Labor Executives' Ass'n.

Before LUMBARD, Chief Judge, and KAUFMAN and MARSHALL, Circuit Judges.

KAUFMAN, Circuit Judge.

The question presented to us on this appeal is the legality under the Railway Labor Act, 45 U.S.C. §§ 151 et seq., the Interstate Commerce Act, 49 U.S.C. § 5 (1), and the Sherman Act, 15 U.S.C. § 1, of the Service Interruption Policy or so-called strike insurance plan adopted by the railroad industry.

Chief Judge Ryan, in the court below, tried the issue of liability and reserved for jury consideration, should it prove necessary, the question of damages. With two lengthy depositions and an agreed statement of facts before him, Judge Ryan held that the industry's strike insurance plan runs afoul of none of the above-mentioned statutes. 211 F. Supp. 478 (S.D.N.Y.1962). He therefore dismissed the complaint of the Brotherhood of Railroad Trainmen (B.R.T.) and its officers against, *inter alia*, the Long Island Rail Road Company, twenty-two other railroads participating in the insurance plan, and the Association of American Railroads (A.A.R.).[1] That complaint sought damages totalling roughly $3,400,000.00 (to be trebled for purposes of the claim under the Sherman Act) for injuries allegedly incurred by the union during its strike of the Long Island Rail Road for twenty-six days in July and August of 1960, injuries which are claimed to have resulted from the "conspiracy and unlawful agreement" consummated by the defendants.

We hold appellants' claim that the strike insurance plan before us constitutes a *per se* violation of the Railway Labor Act, the Interstate Commerce Act, and the Sherman Act to be wholly without merit, for the reasons so thoroughly set forth in the comprehensive opinion of Judge Ryan. We therefore affirm his judgment dismissing the complaint.

The importance of the issue presented in this case, however, warrants additional comment. We shall not repeat in detail the facts fully set out in Judge Ryan's opinion, 211 F.Supp. at 480–486, but shall assume familiarity with them. In essence, the strike insurance plan represented the reaction of the nation's leading railroads to the combined effects of economic distress and selective strike tactics (known as "whipsawing") by the unions. Economic distress was strikingly evident in the year 1959, when the return on investment of the average road was 2.72%, and that of the Long Island Rail Road, 0.72%. The Long Island's principal source of income flows from its 54 million commuter passengers annually, and its predominating element of costs (approximately 67% of its total operating cost) is the wages and benefits paid to employees represented by the appellant B.R.T.; such wages and benefits averaged nearly $8,000 per employee in 1959, an increase of 41% in five years. One of the reasons assigned for the union's success in securing such increases on a nationwide scale in the past decade is its use of the "whipsaw" strike, in which the strike effort is directed at a single railroad; concessions extracted by the union in a single case, it is suggested, soon become predominant throughout the country, because of the highly interdependent wage structure of the railroad industry. The harsh economic impact

1. Membership in the A.A.R. is open to all rail carriers. The Association deals with matters which are of common concern to railroads in the fields of operations, maintenance, engineering, research, purchases and stores, accounting and finance, valuation, taxation, law and legislation, transportation economics, and relations with the public. See Agreed Statement of Facts (Trial Exhibit 1, ¶ 48).

upon the striking employees is cushioned by strike benefits which emanate from a fund to which all railroads are required by law to contribute.

The railroads sought to ameliorate their plight by subscribing to an insurance program which, by supplying a limited amount of funds to roads hit by a certain limited class of strikes, was expected to strengthen their bargaining position and render less economically drastic the effects of a work stoppage. In 1959, after consultations within the Law Committee of the A.A.R. and after making financial arrangements with a London insurance brokerage firm and its newly formed insurance company in the Bahamas, the railroads became subscribing parties to a "Service Interruption Policy." A policy was issued to the Long Island Rail Road upon its deposit of $50,000, specified as its Daily Indemnity; this figure, composed of the average daily fixed costs of the Long Island represented not only its initial deposit but also the amount which would be paid to it daily should it be confronted by a work stoppage as defined in the policy. A similar initial deposit, based upon daily fixed costs, was made by each of the subscribing roads. These premiums constituted the fund from which the strike insurance proceeds were eventually to be paid, and as proceeds were in fact paid out, the fund was supplemented by further pro rata deposits by the non-struck roads during any given strike period.

A "work stoppage" is defined in the insurance contract as

"a cessation of work by a part or all of the employees of the Insured for the purposes of enforcing demands made by one or more labor organizations on, or of resisting proposals of, a common carrier by railroad in instances (1) where such cessation of work (a) is contrary to the provisions of the Railway Labor Act or (b) is to enforce demands contrary to the recommendations of an Emergency Board appointed by the President of the United States, pursuant to the Railway Labor Act or (c) is in resistance to the application of recommendations of such an Emergency Board."

and also, not relevant to the case before us, a cessation of work in which the union's demands affect railroads paying 50% of the premiums and an Emergency Board has not been appointed or has failed to make findings or recommendations. Insurance proceeds are to cover only fixed costs suffered during the course of the strike; property taxes, interest charges on debt, payments toward sinking funds and equipment-purchase obligations, pensions and payments into pension funds, and the expense of supervisory and other forces necessarily incurred during the work stoppage. Such proceeds do not cover the railroad's loss of profits, loss of revenues necessary to carry out rehabilitation programs, or permanent losses resulting from diversion of traffic to alternative roads or alternative forms of transport.

The union demand which precipitated the strike of July and August 1960 centered principally upon the wages and hours of its employees engaged in short turnaround or commuter service; the B.R.T. demanded a reduction of the work week from six days to five days, without any reduction in pay. A strike against the Long Island was set for December 1959 but was postponed when the National Mediation Board interceded in order to encourage further bargaining regarding the terms of a new collective agreement. Bargaining having failed, the Board requested that the parties submit to arbitration; the Long Island consented, but the B.R.T. refused and set a new strike date. A week before that date, the President appointed an Emergency Board, which made findings and recommended that the union withdraw its demands; again, the B.R.T. refused to comply. Further concessions were made by the Long Island (see footnote [3]), none of which were satisfactory to the B.R.T. The strike began on July 10, 1960 and continued until August 3, during which period the railroad was completely shut down.

Since the B.R.T.'s work stoppage fell within the definition in the Service Interruption Policy, the Long Island received its $50,000.00 daily indemnity for each day of the strike, totalling $1,300,-000.00. From the fund contributed by the railroads themselves in accordance with law, strikers and non-strikers received approximately $943,014; the B.R.T. itself paid out more than $158,121, for a total of $1,101,136.00 received by railroad employees during the 26-day walkout.

It is appellants' contention that the strike insurance plan adopted by the railroads undermines the federal policies which lie at the heart of our labor and antitrust laws. We find this contention thoroughly unconvincing. The most critical defect in the appellants' argument before this Court is their misunderstanding as to the nature of a so-called *per se* statutory violation. They argue that the participation of the defendants in the Service Interruption Insurance program constitutes a *per se* violation of the Railway Labor Act, the Sherman Act, and the Interstate Commerce Act and that, in determining this question, the trial court should have excluded all evidence regarding the actual operational effects of the plan as well as the actual course of strike settlement negotiations between the representatives of the Long Island Rail Road and of its employees. They assert that "the only evidence which would be relevant * * * would be (a) the strike insurance plan itself and (b) the *theoretical* operational effect of the plan insofar as it *might* impinge upon competition or any statutory duties imposed on the railroads * * *" (Emphasis added). Thus we are told, as an illustration, that since, in certain conceivable circumstances, insurance proceeds may be so great as to render it more profitable for a struck railroad to acquiesce in a shutdown than to conduct normal operations, the plan is in effect an inducement for the railroad to abstain from collective bargaining;[2] it follows from this, runs the argument, that the strike insurance plan constitutes a *per se* violation of section 152 of the Railway Labor Act, 45 U.S.C. § 152, which imposes upon all carriers the duty "to exert every reasonable effort to make and maintain agreements * * * and to settle all disputes. * * *" Other spectors are conjured up in order to convince us of the necessarily pernicious quality of the railroads' agreement.

 This analysis is founded upon a gravely erroneous premise. For surely the concept of *per se* illegality was not devised in order to lead us down the path once trod by Alice in her journey through the looking glass. That principle is to be applied only to conduct which *of necessity* produces consequences violative of the statute under consideration, see Report of the Attorney General's National Committee to Study the Antitrust Laws 11 (1955), or produces proscribed consequences in such an overwhelming proportion of the cases that minute inquiry in every instance would be wasteful of judicial and administrative resources, see United States v. Trenton Potteries Co., 273 U.S. 392, 397–398, 47 S.Ct. 377, 71 L.Ed. 700 (1927). Appellants have completely failed to establish that participation in the strike insurance plan will necessarily have the serious effects they predict.

Only recently the Supreme Court has spoken on a question analogous to that before us, in National Labor Relations Board v. Insurance Agents' International Union, 361 U.S. 477, 80 S.Ct. 419, 4 L.Ed.2d 454 (1960). In that case, the employer branded as a *per se* unfair labor practice certain harassing tactics sponsored by the union which were avow-

---

**2.** It is interesting, although by no means relied upon by us as probative evidence, that the Chairman of the Railway Labor Executive Association (which filed a brief amicus curiae in support of the appellants) is reported to have said, quite to the contrary of the position espoused here, that strike insurance is not "going to be worth a damn to the railroads." He is said to have added that the railroads "cannot afford to have a strike of any duration * * * even if they're collecting strike insurance." Railway Age, August 29, 1960, p. 9.

edly adopted in order to put economic pressure upon the employer during the course of contract negotiations. The Court upheld the use of economic weapons as "part and parcel" of the system established by our labor laws, 361 U.S. at 489, 80 S.Ct. at 427 and held that "there is simply no inconsistency between the application of economic pressure and good-faith collective bargaining," 361 U.S. at 494–495, 80 S.Ct. at 430. It emphasized, further, that lack of good faith is to be inferred principally from "the union's performance at the bargaining table," 361 U.S. at 490, 80 S.Ct. at 427. It is noteworthy that in his concurring opinion, Justice Frankfurter demonstrated that the cases usually cited in support of the concept of *per se* bad-faith bargaining do not in fact support that proposition, 361 U.S. at 508–510, 80 S.Ct. 419, and stated that a case involving a charge of bad faith turns upon whether "in the context of *all its circumstances,* the respondent has engaged in bargaining without the sincere desire to reach agreement which the Act commands," 361 U.S. at 504, 80 S.Ct. at 435 (emphasis added). In language quite relevant to the case before us, he declared:

> " * * * in determining the state of mind of a party to collective bargaining negotiations the Board does not deal in terms of abstract 'economic pressure.' It must proceed in terms of specific conduct which it weighs as a more or less reliable manifestation of the state of mind with which bargaining is conducted."

361 U.S. at 505, 80 S.Ct. at 435.

We are thus impelled to the conclusion that, in a case such as this, the railroad's good faith in the bargaining process should depend principally upon the conduct of the railroad's representatives at the bargaining table; this may, in turn, be viewed against such circumstances as any history of employer animus toward the union, the extent of insurance coverage (for example, whether there is reimbursement of only fixed costs, as here, or of lost profits as well) and its relationship to the economic needs of the road in the face of a protracted business interruption, and the availability and extent of economic pressures exerted by the union (such as strike benefits for the striking employees) as an index of the union's capacity to withstand the work stoppage. Judge Ryan was therefore correct in receiving evidence of the history of bargaining negotiations, 211 F.Supp., at 485, 488,[3] and in concluding that the strike insurance plan, far from constituting a violation of the railroad's duty to bargain in good faith, was an instrument of self-help properly employed in the process of collective bargaining.[4]

---

3. "It appears from the record that the Long Island made a series of counterproposals to the union in the course of the bargaining; that it accepted the Mediation Board's proffer of arbitration; that it accepted the recommendations of the Presidential Emergency Board and then offered to settle on a basis more favorable to the union than the recommendations of the Board; that twice it accepted proposals by New York State authorities to submit the dispute to arbitration; and that it agreed to the proposal of the Governor of New York which granted the five-day week over and above the increased wages received by the B.R.T. as a part of the national wage scale, thus putting an end to the 26-day strike."

4. It cannot be overlooked that the payment of proceeds under the strike insurance plan is a purely defensive measure and is triggered only by a narrowly circumscribed class of strike activity, i. e., to the extent relevant, strikes contrary to the provisions of the Railway Labor Act, and strikes in resistance to or for the purpose of enforcing demands contrary to the recommendations of an Emergency Board appointed by the President. Compare cases upholding multi-employer lockout agreements, N. L. R. B. v. Truck Drivers Union, 353 U.S. 87, 77 S.Ct. 643, 1 L.Ed.2d 676 (1957); Clune v. Publishers' Association, 314 F.2d 343 (2d Cir., 1963), affirming, on the opinion of the District Judge, 214 F.Supp. 520 (S.D. N.Y.1963); American Brake Shoe Co. v. N. L. R. B., 244 F.2d 489 (7th Cir., 1957).

■ It is interesting to note, in passing, that appellants quite properly justify the payment of more than $1,100,000.00 in strike benefits to the striking employees by relying upon Congress' specific declaration that the payment of benefits to employees during a labor dispute is not to be deemed a violation of any federal law and shall be immune from injunction in the federal courts. See section 20 of the Clayton Act, 29 U.S.C. § 52,[5] and section 4 of the Norris-LaGuardia Act, 29 U.S.C. § 104.[6] The parties in this case do not challenge the use of employee strike benefits as a union shield for the purpose of withstanding the adverse economic effects of a strike—as well as a club in the union's pressure arsenal—designed to bring about an early and favorable settlement. Yet, by some obfuscated reasoning, the appellants insist that the same economic benefits, when accruing to the employer who participates in the strike insurance plan before us, should be outlawed on the theory that they strike at the very vitals of the bargaining provisions of the Railway Labor Act.

We find support for the conclusion we reach today in a recent and authoritative decision of the Civil Aeronautics Board. The Board, upholding the validity of the so-called mutual aid pact adopted by the major airlines and quite similar to the strike insurance plan before us, noted:

"The agreement, although increasing management's abilities to withstand the economic impact of strikes in the same manner that union strike benefits cushion the economic effect on employees, does not purport to affect the carriers' duties under the Railway Labor Act to bargain in earnest. Nothing presented by the parties shows that the operation of the agreement will, in fact, induce the carriers to disregard the obligations imposed by law. Neither matters of record nor fair inferences to be drawn therefrom justify a finding that the agreement will constitute an impediment to *bona fide* collective bargaining."

Six-Carrier Mutual Aid Pact, 29 C.A.B. 168, 171 (1959).[7]

■ We next address ourselves to appellants' assertions that the strike insurance plan constitutes a *per se* violation of the Sherman Act and of a similar but more specific proscription within the Interstate Commerce Act. These assertions must also fail, for the fundamental reason that the named statutes were designed principally to outlaw restraints upon commercial competition in the mar-

---

5. " * * * no such restraining order or injunction shall prohibit any person or persons * * * from paying or giving to * * * any person engaged in such dispute, any strike benefits or other moneys or things of value; * * * nor shall any of [these] * * * acts * * * be considered or held to be violations of any law of the United States."

6. "No court of the United States shall have jurisdiction to issue any restraining order or temporary or permanent injunction in any case involving or growing out of any labor dispute to prohibit any person or persons participating or interested in such dispute (as these terms are herein defined) from * * * paying or giving to * * * any person participating or interested in such labor dispute, any strike or unemployment benefits or

insurance, or other moneys or things of value * * *."

7. The appellants' contention, again purely speculative, that the strike insurance plan improperly introduces an element of multi-employer bargaining into railroad labor relations, is amply discussed and refuted by Judge Ryan, 211 F.Supp. at 488. Cf. Six-Carrier Mutual Aid Pact, 29 C.A.B. at 172–73.

Having decided, on the merits, that the strike insurance plan does not constitute a *per se* violation of the Railway Labor Act, we find it unnecessary to determine whether any such violation could possibly give rise to an action for damages. See Louisville & N. R. R. v. Brown, 252 F.2d 149, 155 (5th Cir.) (no statutory right of action for damages for breach of duty to exert all reasonable effort to settle dispute), cert. denied, 356 U.S. 949, 78 S.Ct. 913, 2 L.Ed.2d 843 (1958).

keting and pricing of goods and services and were not intended as instruments for the regulation of labor-management relations.

■■ Even were we to assume that the strike insurance plan in some way was the "cause" of an interruption in interstate commerce, the Supreme Court has clearly stated that "the Sherman Act * * * does not condemn all combinations and conspiracies which interrupt interstate transportation," Apex Hosiery Co. v. Leader, 310 U.S. 469, 486, 60 S.Ct. 982, 84 L.Ed. 1311, 128 A.L.R. 1044 (1940), and that "the end sought was the prevention of restraints to free competition in business and commercial transactions which tended to restrict production, raise prices or otherwise control the market to the detriment of purchasers or consumers of goods and services," 310 U.S. at 493, 495, 501, 512, 60 S.Ct. at 1002. Surely it cannot be

said that the instant form of railroad cooperation in combatting the risks of labor unrest effects an unnatural and anticompetitive regulation of the pricing, supply, or distribution of goods or services.[8] Appellants urge, however, that the price of *labor* is artificially manipulated whenever a railroad is permitted to avail itself of the proceeds of strike insurance. The answer lies in the clear language of section 6 of the Clayton Act, 15 U.S.C. § 17: "The labor of a human being is not a commodity or article of commerce." As an outstanding scholar in the field of labor law has noted: "No one seriously suggests that antitrust policy should be concerned with the labor market per se." Cox, "Labor and the Antitrust Laws—A Preliminary Analysis," 104 U. of Pa.L. Rev. 252, 254 (1955).[9]

■ Finally, the claim of violation of the Interstate Commerce Act is no more persuasive. Section 5(1) of the act, 49

---

8. Compare Six-Carrier Mutual Aid Pact, 29 C.A.B. at 175: " * * * we cannot conclude that the financial assistance provisions of the agreement will substantially lessen competition within the air transportation industry. The commercial advantages of building goodwill and permanently capturing diverted traffic mitigate against any dampening of competition between operating signatory carriers."

In a recent case involving an agreement among newspaper publishers to suspend publication in the event of a "whipsaw" strike, wherein the union alleged a *per se* violation of the Sherman Act, the court stated:

"It is well to note that this agreement (1) does not fix prices; (2) does not allocate territorially the sale or distribution of newspapers; (3) does not preclude the establishment of competing journals in the New York area; (4) does not provide any discrimination between the would-be purchasers of any newspapers; (5) involves no control of advertising."

Clune v. Publishers' Association, 214 F. Supp. 520, 524 (S.D.N.Y.), affirmed on the opinion of the District Judge, 314 F. 2d 343 (2d Cir. 1963).

9. The cases cited by appellants in support of the contention that the labor of a human being is a "commodity" within the Sherman Act when trafficked in by persons other than labor unions clearly do not support their position. These cases merely hold that the act is violated when businessmen engage with a union in, or use the guise of the union for the purpose of, controlling the prices or allocating the market for their goods. See, e. g., Los Angeles Meat & Provision Drivers Union v. United States, 371 U.S. 94, 97, 83 S.Ct. 162, 9 L.Ed.2d 150 (1962); United Brotherhood of Carpenters v. United States, 330 U.S. 395, 399, 67 S.Ct. 775, 91 L.Ed. 973 (1947); Allen Bradley Co. v. Local Union No. 3, IBEW, 325 U.S. 797, 800, 809–810, 65 S.Ct. 1533, 89 L.Ed. 1939 (1945).

We do not decide whether appellants have the requisite standing to challenge the strike insurance plan under the antitrust laws. See Clune v. Publishers' Association, 214 F.Supp. at 525:

"The reason plaintiffs are affected is not that trade or commerce among the several states is restrained, but because the economic pressure of employers against employees affects their employment * * * [I]n order to state a cause of action under the anti-trust laws, a plaintiff must show * * * that he is within that area of the economy which is endangered by a breakdown of competitive conditions in a particular industry, otherwise he is not injured 'by reason' of anything forbidden in the anti-trust laws."

U.S.C. § 5(1), provides: "Except upon specific approval by order of the Commission * * * it shall be unlawful for any common carrier * * * to enter into any contract, agreement, or combination with any other such common carrier or carriers for the pooling or division of traffic, or of service, or of gross or net earnings, or of any portion thereof * * *." We believe this section to be an expression of transportation policy solely, and not of labor policy. Thus, at the time the act was passed, "pooling" was defined as

> simply an understanding or agreement among the roads that each shall take a certain proportion of the business of the territory they compete for, and in the event of their not being able to divide the business physically, they equalize the disadvantages by dividing profits.

See S.Rep.No. 46, 49th Cong., 1st Sess., Appendix p. 153 (1886). It may be true that the collection of premiums and payment of proceeds to a struck railroad might be viewed literally as the "division * * * of gross or net earnings," since contributions to the insurance fund were from the passenger and freight revenues of the participating roads. But so too are their contributions to the A.A.R., a trade association

(see footnote [1]) whose expenses are met by assessments from its members in proportion to their operating revenues;[10] but we do not understand the appellants to contend that the mere existence of the A.A.R., or of any other trade association in the transportation field, runs afoul of the anti-pooling provision of the Interstate Commerce Act, and also, incidentally, of the Sherman Act. Similarly here, the strike insurance plan does not represent an attempt to apportion business among competing railroads on a basis other than individual performance. Its validity under the Interstate Commerce Act § 5(1) can thus hardly be doubted.[11]

Since we have found no violation of the Railway Labor Act, the Sherman Act, or the Interstate Commerce Act, there is no need to consider whether, as contended by appellees, their strike insurance plan is expressly rendered lawful by section 20 of the Clayton Act and section 4 of the Norris-LaGuardia Act (see footnotes [5] and [6]), or whether those statutes were meant to shelter only those strike-benefit programs adopted by labor. See Clune v. Publishers' Association, 214 F. Supp. 520, 528–29 (S.D.N.Y.), affirmed on the opinion of the District Court, 314 F.2d 343 (2d Cir., 1963).[12]

Judgment affirmed.

10. See Agreed Statement of Facts (Trial Exhibit 1, ¶ 59), and Exhibit 1 (A.A.R. Plan of Organization), Article 20.

11. There was thus no need for the participating railroads to secure the prior consent of the Interstate Commerce Commission; 49 U.S.C. § 5(1). The submission for approval to the Civil Aeronautics Board of the airlines' mutual aid pact was apparently dictated by statutory language considerably broader than that of the anti-pooling provision of section 5(1) of the Interstate Commerce Act. See section 412 of the Federal Aviation Act, 49 U.S.C. § 492:

> "Every air carrier shall file with the Board a true copy * * * of every contract or agreement * * * affecting air transportation * * * between such air carrier and any other air carrier * * * for pooling or apportioning earnings, losses, traffic, service, or equipment * * * or for preserving and improving safety, economy, and efficiency of operation, * * * or for other cooperative working arrangements."

12. But see Brotherhood of Locomotive Engineers v. Baltimore & O. R. R., 310 F.2d 513 (7th Cir., 1962).