## AMALGAMATED CLOTHING AND TEXTILE WORKERS UNION, Plaintiff,

### v.

## J. P. STEVENS & CO., INC., Defendant.

### No. 77 Civ. 5444–CSH.

United States District Court, S. D. New York.

Aug. 3, 1979.

---

Arthur M. Goldberg, Gen. Counsel, Amalgamated Clothing and Textile Workers Union, New York City, Szold, Brandwen, Meyers & Altman, New York City, Alan G. Blumberg, Ezra N. Goodman, Richard G. Liskov, David N. Kaye, New York City, of counsel, for plaintiff.

Paul, Weiss, Rifkind, Wharton & Garrison, New York City, Jay Topkis, Gerald D. Stern, Howard S. Veisz, Jamie B. W. Stecher, New York City, of counsel, for defendant.

## MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge:

Plaintiff Amalgamated Clothing and Textile Workers Union ("ACTWU") brought this action in continuance and escalation of the prolonged struggle between defendant J. P. Stevens & Co., Inc. ("Stevens") and plaintiff and its predecessor unions. Until now the battlefields have been the National Labor Relations Board ("NLRB"), and circuit courts of appeal asked to enforce NLRB rulings against Stevens or punish Stevens for contempt.[1] ACTWU now invokes the antitrust laws and the civil rights laws and prays, in aid of its efforts to organize Stevens' employees, for declaratory and injunctive relief, as well as treble, compensatory, and punitive damages. Stevens has moved to dismiss the complaint for lack of standing, lack of subject matter jurisdiction, and failure to state a claim upon which relief can be granted. The motion is granted and the complaint dismissed.

### I.

ACTWU's complaint states six causes of action. The first two are pleaded under the Sherman Antitrust Act, 15 U.S.C. §§ 1–7, and the Clayton Act, 15 U.S.C. § 12 *et seq.*, jurisdiction in this Court being founded upon 15 U.S.C. § 15 and 28 U.S.C. § 1337. The third, fourth, fifth and sixth causes of action are said to arise under the civil rights laws, 42 U.S.C. § 1983 (third cause), § 1985 (fourth cause), § 1986 (fifth cause), and all of them collectively (sixth cause); jurisdiction is alleged under 28 U.S.C. § 1343.

Reserving the civil rights causes of action for later discussion, we analyze under this heading the antitrust allegations.

---

1. For historical summaries, see *NLRB v. J. P. Stevens & Co., Inc.*, 563 F.2d 8, 13 (2d Cir. 1977), *cert. denied*, 434 U.S. 1064, 98 S.Ct. 1240, 55 L.Ed.2d 765 (1978); *J. P. Stevens & Co., Inc. v. Jackson*, 99 LRRM 2827, 2828 n.2 (N.D.Ga.1978).

For the first cause of action, ¶¶ 2–5 of the complaint describe ACTWU, its predecessor unions, and the union's present size and structure. Paragraph 2 alleges that ACTWU "is engaged in the trade or business of an international union"; the action is said to be brought on its own behalf and on behalf of its members.

Paragraphs 6–8 describe Stevens as a Delaware corporation maintaining its principal offices within this district, and engaged in the interstate commerce of manufacturing, processing and selling textile goods and products.

Paragraphs 9 and 10 describe the efforts of ACTWU and its predecessors, "for many years" and currently, to organize Stevens' non-supervisory employees and obtain collective bargaining agreements for them, as well as for employees of other textile companies.

Paragraphs 11 and 12 allege that Stevens, "other textile manufacturers and processors and others" have opposed and resisted these efforts, and that Stevens, in furtherance of such opposition and resistance, has engaged in unlawful combinations and conspiracies in restraint of trade.

Paragraph 13 describes, without naming,[2] those persons or entities with whom Stevens is alleged to have combined and conspired. They are said to consist of other textile manufacturers; national and local trade and industry associations; employer-supported groups of employees; non-textile employers and businesses in areas where Stevens operates plants; chambers of commerce and similar organizations in such areas; state and local development authorities in such areas; local and state governmental officials and agencies in such areas; and "other persons and entities which are presently unknown to plaintiff."

Paragraph 14 describes the acts, generally and without specifics, allegedly committed by Stevens and its co-conspirators. The allegations, stripped of certain verbiage, describe the following kinds of behavior:

(a) Fixing or limiting wages and working conditions by means of agreements between competing textile companies.

(b) Discharging, harassing or discriminating against employees who support ACTWU's efforts.

(c) Committing violations "of the national labor laws" in order to obstruct ACTWU from its organizational and representational activities, and of preventing ACTWU members from their activities, such violations of the labor laws including improper interrogation, surveillance, harassment, and improper procedures in connection with elections to have ACTWU designated as the bargaining representative of the employees.

(d) Refusing to hire and "blacklisting" employees and others who support ACTWU.

(e) Causing or inducing other employers, both within and without the textile industry, to refuse to hire and to "blacklist" employees and persons who support ACTWU.

(f) Discharging or refusing to hire relatives, friends and family members of employees who support ACTWU.

(g) Causing or inducing other employers, both within and without the textile industry, to discharge or refuse to hire relatives, friends and family members of employees who support ACTWU.

(h) Causing or inducing banks, lending and credit organizations, landlords, employers' insurance carriers and their representatives, and business men to discriminate against or refuse to deal with ACTWU, or employees who support ACTWU, their relatives, friends and family members.

(i) Causing or inducing officials and agencies of local and state government to discriminate against such employees, their relatives, friends and family members, with respect to gov-

2. The only exception is J. P. Stevens Employees Educational Committee, alleged to be "an employer supported organization of Stevens employees." ¶ 13(c).

ernmental relief and welfare benefits and programs.

(j) Working in concert with chambers of commerce, development authorities, trade and employer associations, and other organizations, to prevent the development of unionized industry in the areas where Stevens operates its textile plants.

(k) Causing or inducing the formation of the J. P. Stevens Employees Educational Committee, whose fundamental goal is to obstruct ACTWU's efforts.

(l) Obtaining financial and other support for the J. P. Stevens Employees Educational Committee from competing textile manufacturers and other anti-union employers and textile and industrial trade associations.

(m) Causing, inducing and encouraging the formation of other employer-supported groups of textile industry employees with goals similar to that of the J. P. Stevens Employees Educational Committee.

(n) Refusing to negotiate in good faith with ACTWU for collective bargaining agreements where ACTWU has been designated as bargaining representative.

(o) Closing or threatening to close textile plants where ACTWU has been designated as bargaining representative, or where it appears that ACTWU would be so designated if free elections were allowed to be held.

(p) Abusing the judicial and administrative process by prolonged, frivolous, and contemptuous resistance to requirements of law.

(q) Inciting and exploiting racial discord within textile plants and their communities, with the intent of intimidating and harassing black employees who support ACTWU's efforts, and inciting white employees to oppose those efforts.

(r) Exchanging information, discussing and agreeing upon tactics to be followed to oppose ACTWU's efforts.

(s) Developing a common scheme or plan pursuant to which these acts were committed, and are being committed.

(t) Committing other acts in furtherance of said combinations and conspiracies, presently unknown to ACTWU.

Paragraph 15 alleges that, by reason of these unlawful acts of Stevens and its co-conspirators, ACTWU and its members have been injured in their business and property. ACTWU alleges damages arising out of its unlawful prevention and restraint from its right to organize and represent employees in the textile industry. Various injuries are alleged on behalf of the ACTWU members, arising out of the wrongful acts previously alleged. Treble damages are requested on behalf of all such interests, pursuant to 15 U.S.C. § 15.

The second cause of action realleges the allegations of ¶¶ 1 through 15, and further alleges that Stevens' unlawful acts, in violation of the antitrust laws, are continuing and will continue unless enjoined, in consequence of which ACTWU alleges that it is entitled to injunctive relief pursuant to 15 U.S.C. § 26 (Complaint, ¶¶ 17–20).

## II.

The ACTWU and Stevens have, until now, battled each other up and down the halls of the NLRB. That is where Stevens says they should remain. The National Labor Relations Act of 1935, 29 U.S.C. § 151 *et seq.* ("NLRA"), and the Labor Management Relations Act of 1947, 29 U.S.C. § 141 *et seq.* ("LMRA"), established national policy favoring collective bargaining, forbade various employer practices and labor practices as unfair, and set up the NLRB as the enforcement agency. The NLRB has exclusive competence over any activity "arguably subject" to § 7 or § 8 of the National Labor Relations Act, *San Diego Building Trades Council v. Garmon,* 359 U.S. 236, 245, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959), a concept restated in *Motor Coach Employees v. Lockridge,* 403 U.S. 274, 292, 91 S.Ct. 1909, 29 L.Ed.2d 473 (1971) as pre-empting state and federal court jurisdiction "to remedy conduct that is arguably protected . . .

or prohibited by . . . the Act." Stevens relies, in part, on this principle in moving for dismissal of the complaint.

ACTWU responds, correctly, that neither *Garmon* nor *Lockridge* involved antitrust claims, as the case at bar is said to do. The interaction of antitrust policy and labor policy, described by one commentator as "intrinsically incompatible,"[3] has generated considerable litigation. Many cases arise when a company raises the sword of antitrust law against a union, and the union parries with the shield of labor law. This has been the greatest area of involvement of the Supreme Court, whose leading decisions are *Apex Hosiery Co. v. Leader*, 310 U.S. 469, 60 S.Ct. 982, 84 L.Ed. 1311 (1940); *United States v. Hutcheson*, 312 U.S. 219, 61 S.Ct. 463, 85 L.Ed. 788 (1941) (a criminal antitrust charge initiated by the government); *Allen Bradley Co. v. Electrical Workers Local 3*, 325 U.S. 797, 65 S.Ct. 1533, 89 L.Ed. 1939 (1945); *United Mine Workers v. Pennington*, 381 U.S. 657, 85 S.Ct. 1685, 14 L.Ed.2d 626 (1965); *Meat Cutters Local 189 v. Jewel Tea Co.*, 381 U.S. 676, 85 S.Ct. 1596, 14 L.Ed.2d 640 (1965); *Ramsey v. United Mine Workers*, 401 U.S. 302, 91 S.Ct. 658, 28 L.Ed.2d 64 (1971); and *Connell Construction Co. v. Plumbers and Steamfitters Local 100*, 421 U.S. 616, 95 S.Ct. 1830, 44 L.Ed.2d 418 (1975). In each of these cases, an employer, an affected company, or the government (as in *Hutcheson*) contended that union activity violated the antitrust laws. The decisions turned, in the main, upon the Court's perception of the "labor exemption" from the antitrust laws, deriving either from such statutory exemptions as appear in legislation[4] or the "nonstatutory exemption" conferred by Court decisions in recognition of "the strong labor policy favoring the association of employees to eliminate competition over wages and working conditions." *Connell*, *supra*, 421 U.S. at 622, 95 S.Ct. at 1835. These "labor exemption" cases are lucidly reviewed in Sullivan, *Handbook of the Law of Antitrust* (1977), at pp. 723–731. Out of the welter of opinions generated by these cases, Professor Sullivan distills an overall approach:

> "In their totality these cases suggest both an analytical stance and an objective: to reconcile labor and antitrust policy where possible and, where not, to weigh claims of each and give way to the stronger." *Id.* at 729.

The task, he acknowledges, is a difficult one. The Second Circuit has said that the accommodation of the conflicting federal antitrust and labor law policies presents "a troublesome and unruly issue." *Commerce Tankers v. National Maritime Union of America*, 553 F.2d 793, 801 (2d Cir. 1977), quoting Meltzer, *Labor Unions, Collective Bargaining, and the Antitrust Laws*, 32 U.Chi.L.Rev. 659 (1965). See also Comment, *Labor vs. Antitrust: An Inherent Congressional Quandary*, 44 Brooklyn L.Rev. 821 (1978).

While the cited cases appear prominently in the briefs of the parties in the case at bar, they deal, as has been noted, with antitrust charges being made against unions. We are here presented with a union's charge that a company is violating the antitrust laws. Not surprisingly, this situation has arisen far less frequently.

At the outset, I reject Stevens' contention that ACTWU lacks standing to make the claim. While board chairmen and company presidents of the early years of this century might have had difficulty in thinking of labor union organizers as fellow businessmen, it is now well settled that: "Unions are in the business of representing employees." *Tugboat, Inc. v. Mobile Tow-*

---

3. St. Antoine, Connell: *Antitrust Law at the Expense of Labor Law*, 62 Va.L.Rev. 603, 604 (1976).

4. Section 6 of the Clayton Act, 15 U.S.C. § 17, states in effect that labor is not an article of commerce and that the antitrust laws should not forbid labor organizations. Section 20, 29 U.S.C. § 52, limits the federal courts' injunctive powers and lists certain union activities which are not to be regarded as violative of United States law. Further declarations of the freedom of employees to organize, and limitations upon the federal courts' injunctive powers in labor disputes, appear in the Norris-LaGuardia Act, 29 U.S.C. §§ 101–110, 113–115.

*ing Company,* 534 F.2d 1172, 1176 (5th Cir. 1976). Hence, as that case holds, a union has standing to assert a claim that an antitrust conspiracy involving employers damages its ability to attract members. I am aware of no Supreme Court or Second Circuit decisions to the contrary, and hold on the authority of *Tugboat, Inc.* that ACTWU has sufficient standing to survive a motion to dismiss the complaint.[5]

 We come, then, to Stevens' primary attack on the sufficiency of the antitrust claim. ACTWU argues that the § 6 Clayton Act labor exemption redounds only to the benefit of labor, and cannot be availed of by an employer. I accept that principle, but it does not meet Stevens' primary argument, which is that the allegations in ACTWU's complaint, taken as true on this motion to dismiss, simply do not state a cause of action within the antitrust laws. That contention is sound.

In *Apex Hosiery, supra,* members of a union took forcible possession of a plant, impeding shipments destined for interstate commerce. The employer sued the union for restraint of trade in violation of the Sherman Act. The Supreme Court affirmed dismissal of the complaint on the basis of lack of jurisdiction under the antitrust laws, stating 310 U.S. at 495–497, 60 S.Ct. at 993–994:

> ". . . this Court has never applied the Sherman Act in any case, whether or not involving labor organizations or activities unless the Court was of opinion that there was some form of restraint upon commercial competition in the marketing of goods or services and finally this Court has refused to apply the Sherman Act in cases like the present in which local strikes conducted by illegal means in a production industry prevented interstate shipment of substantial amounts of the product but in which it was not shown that the restrictions on shipments had

operated to restrain commercial competition in some substantial way."

These principles still obtain; and they serve to explain the survival of the union's antitrust complaint in *Tugboat, Inc., supra,* upon which ACTWU places heavy reliance. Two towing companies, Tugboat, Inc. and Mobile Towing Co., were competitors in the tugboat services market in Mobile Bay. The plaintiff union, Seafarers International, and another union, the International Organization of Masters, Mates and Pilots, were contesting the right to represent the workers in the local tugboat industry. Seafarers invoked the antitrust laws against Tugboat, Inc. and its rival union. The Fifth Circuit reversed dismissal of the complaint; the Court of Appeals' analysis of the claim is central to the decision:

> "The essence of the claims in both of these actions is that Tugboat, Inc., conspired with members of Masters, Mates, and Pilots, a union whose local the owners of Tugboat, Inc., allegedly dominate, to restrain trade in the local towing industry by unfairly obtaining labor costs far cheaper than those available to Mobile Towing Co. . . . As alleged, the conspiracy between Tugboat and Masters, Mates, and Pilots allowed Tugboat to prevent Seafarers from organizing Tugboat's employees thus allowing Tugboat to avoid the higher wages and larger crews called for in Seafarer's agreement with Mobile Towing. By reducing costs, Tugboat would be able to run Mobile Towing out of business and monopolize the market. The question for this court is whether the unions or their members may argue that these practices violate the antitrust laws and entitled them to relief."

Clearly, therefore, the facts in *Tugboat, Inc.* presented a form of "restraint upon commercial competition in the marketing of goods or services" held in *Apex Hosiery* to

---

5. If the case were to continue, other questions of standing might arise, such as that of the ACTWU to claim individual damages on behalf of its members. A possible solution, assuming the existence of a problem, would be the intervention of individual employees as plaintiffs, and the certification of the suit as a class action. Because the complaint must be dismissed on other grounds, this subject need not be further pursued.

be an essential element of an antitrust claim.[6]

Where that element is missing, a union cannot invoke the Sherman Act in complaining of obstruction of its organizational and representational efforts. *United Brick & Clay Workers v. Junction City Clay Co.,* 158 F.2d 552 (6th Cir. 1946), which cites and follows *Apex,* is squarely in point. The plaintiff union was the national organization of workers in the brick and clay industry. The union charged several clay companies, an alleged strike-breaking concern, and other parties with conspiracy to impede and thwart its representational efforts. The Court of Appeals affirmed dismissal of the complaint, holding that the NLRB had exclusive jurisdiction of the union's claims. The antitrust claim did not alter that result:

"The acts described in the petition do not come within the purview of the Sherman Antitrust Act, for they do not allege the imposition by appellees of any form of restraint upon commercial competition in the marketing of goods or service. *Apex Hosiery Co. v. Leader,* 310 U.S. 469, 493–500, 60 S.Ct. 982, 84 L.Ed. 1311, 128 A.L.R. 1044." 158 F.2d at 554.

The Second Circuit applied *Apex* in *Kennedy v. Long Island Railroad Company,* 319 F.2d 366 (2d Cir.), *cert. denied,* 375 U.S. 830, 84 S.Ct. 75, 11 L.Ed.2d 61 (1963), in which the plaintiff union challenged on Sherman Act grounds a "strike insurance" pact entered into by a number of railroads, which supplied a limited amount of funds to roads hit by a certain limited class of strikes. Affirming dismissal of the complaint, Chief Judge Kaufman said in part:

"Even were we to assume that the strike insurance plan in some way was the 'cause' of an interruption in interstate commerce, the Supreme Court has clearly stated that 'the Sherman Act * * * does not condemn all combinations and conspiracies which interrupt interstate transportation,' *Apex Hosiery Co. v. Leader,* 310 U.S. 469, 486, 60 S.Ct. 982, 84

---

**6.** The other cases relied upon by ACTWU are similarly distinguishable. *Carpenters District Council v. United Contractors Association of Ohio, Inc.,* 484 F.2d 119 (6th Cir. 1973), *modified,* 539 F.2d 1092 (6th Cir. 1976), and *International Association of Heat and Frost Insulators and Asbestos Workers v. United Contractors Association, Inc.,* 483 F.2d 384 (3rd Cir. 1972), *modified,* 494 F.2d 1353 (3rd Cir. 1974), represented, as characterized by the Court in *East Central Ohio Building and Construction Trades Council v. Landmark, Inc.,* (N.D.Ohio, April 26, 1977), an effort by the defendants "to lessen competition by organizing and directing a 'sham' union." *East Central,* slip op. at 5. Thus in the *International Association* case, the complaint alleged that "an object of the illegal combination and conspiracy is to prevent the Unions from representing for collective bargaining purposes employees of the members of the Association and thus to obtain *a competitive advantage* over employer parties to collective bargaining arrangements with the Unions . . ." 483 F.2d at 387 (emphasis added). In *East Central,* the defendants were charged with comparable monopolistic objectives, albeit by a different device. *East Central* distinguished *Prepmore Apparel, Inc. v. Amalgamated Clothing Workers of America,* 431 F.2d 1004 (5th Cir. 1970), upon which Stevens relies in the case at bar, because the complaint in *Prepmore* alleged only a conspiracy to "injure the union and destroy its operations . . ." 431 F.2d at 1006. The Court in *East Central* observed that in *Prepmore,* "there was apparently no allegation that the offending employer conspired to monopolize or otherwise restrain trade." Slip op. at 6. But the allegations in the complaint at bar mirror those of *Prepmore,* since their essential thrust is that Stevens, in conspiracy with others, seeks to frustrate the union. Relying upon *Apex, supra,* and subsequent Supreme Court authority, the Fifth Circuit said in *Prepmore:*

"There is no indication, however remote, of a conspiracy or combination on the part of Prepmore and Blue Bell to restrain competition in the marketing of Prepmore's goods. In sum, the allegations of the first count of the counterclaim do not rise to the level of alleging a restraint of the type to which the Sherman Act is directed. *Apex Hosiery Co. v. Leader, supra.* It follows that the district court did not err in dismissing the count." 431 F.2d at 1007.

See also *United Brick & Clay Workers v. Junction City Clay Co.,* 158 F.2d 552 (6th Cir. 1946), *infra.*

L.Ed. 1311, 128 A.L.R. 1044 (1940), and that 'the end sought was the prevention of restraints to free competition in business and commercial transactions which tended to restrict production, raise prices or otherwise control the market to the detriment of purchasers or consumers of goods and services,' 310 U.S. at 493, 495, 501, 512, 60 S.Ct. at 1002. Surely it cannot be said that the instant form of railroad cooperation in combatting the risks of labor unrest effects an unnatural and anticompetitive regulation of the pricing, supply, or distribution of goods or services. Appellants urge, however, that the price of labor is artificially manipulated whenever a railroad is permitted to avail itself of the proceeds of strike insurance. The answer lies in the clear language of section 6 of the Clayton Act, 15 U.S.C. § 17: 'The labor of a human being is not a commodity or article of commerce.' As an outstanding scholar in the field of labor law has noted: 'No one seriously suggests that antitrust policy should be concerned with the labor market per se.' Cox, 'Labor and the Antitrust Laws—A Preliminary Analysis,' 104 U. of Pa.L. Rev. 252, 254 (1955)." 319 F.2d at 373.

That proposition of Professor Cox—quoted by the Second Circuit in *Kennedy*—that antitrust policy is not "concerned with the labor market per se" is echoed by the Supreme Court's latest decision in *Connell, supra,* in which the union activity in question (striking in successful effort to force a number of general contractors to agree to subcontract work only to subcontractors which had current collective bargaining agreements with the union) was held the proper basis of a federal antitrust suit:

". . . because it has a potential for restraining competition in the business market in ways that would not follow naturally from elimination of competition over wage and working conditions." 421 U.S. at 635, 95 S.Ct. at 1841.

■ These authorities are dispositive, and require dismissal of the antitrust claims. The claims alleged "arguably" fall within the labor laws; indeed, a number of them virtually parrot statutory definitions of unfair labor practices. The antitrust laws do not furnish a remedy, since ACT-WU's allegations, taken separately or in concert, do no more than complain of efforts to impede its activities as a union, entirely unaccompanied or uncomplicated by any element of monopolistic effect upon competition in the marketplace for goods or services. As such, the allegations do not rise to the level of an antitrust violation; and in consequence there is no basis to depart from the rule of *Garmon* and *Lockridge, supra.*

I fully appreciate the difficulties ACTWU has encountered in bringing Stevens, that "notorious recidivist," [7] to book by appealing to the labor laws and the NLRB. The union's frustration and desire to strike out in other directions are equally understandable. Recognizing that Stevens' miserable record of noncompliance with NLRB and court orders "raises grave doubts about the ability of the courts to make the provisions of the federal labor law work in the face of persistent violations," *NLRB v. J. P. Stevens & Co., Inc., supra,* 563 F.2d at 25–26, the problem may not legitimately be solved by reference to another body of law which is simply not applicable. To use a homely analogy: I may, as a tenant, be harassed and frustrated by the inadequacies and inattention of my landlord; and I may have found the law of landlord and tenant, and the special courts relating to them, inadequate fully to redress my grievances; but that does not justify my requesting the district attorney to prosecute the landlord under a penal law whose provisions do not apply to the facts of my situation.

So here, if the federal labor laws permit Stevens to flout them with impunity, the remedy must lie in a revision of those laws by the Congress.

---

7. *NLRB v. J. P. Stevens & Co., Inc., supra,* 563 F.2d at 13, quoting Bartosie and Lanoff, *Escalating the Struggle Against Taft-Hartley Contemnors,* 39 U.Chi.L.Rev. 255, 256 n.4 (1972).

The first and second causes of action, alleging violations of the antitrust laws, will be dismissed.

### III.

Even if the NLRB were not lurking in the background, ACTWU's causes of action based upon the civil rights statutes are legally insufficient.

■■■ The third cause of action (¶¶ 21–25) purports to state a claim under 42 U.S.C. § 1983, the provisions of which are set out in the margin.[8] Section 1983 applies only to persons who deprive citizens of their rights "under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory . . ." Stevens itself, of course, does not operate under color of state law. While the complaint alleges that Stevens conspired with local and state officials, and other authorities acting under color of law, no specifics whatsoever are given, in respect of name, date, place, or nature of the activity complained of. The pleading is entirely deficient under the law of this Circuit. While a private person, not himself an officer of the state, may be proceeded against under § 1983 if "he is a willful participant in joint activity with the State or its agents," *United States v. Price*, 383 U.S. 787, 794, 86 S.Ct. 1152, 1157, 16 L.Ed.2d 267 (1966), the plaintiff must in order to state a cause of action specifically identify the public officials concerned, and, as to such officials, specifically allege their personal involvement in the acts complained

of. *Powell v. Workmen's Compensation Board*, 327 F.2d 131 (2d Cir. 1964); *Koch v. Yunich*, 533 F.2d 80 (2d Cir. 1976); *Fine v. City of New York*, 529 F.2d 70 (2d Cir. 1975); *Colon v. State of New York Division of Human Rights*, 354 F.Supp. 343 (S.D.N.Y.1973), aff'd, 498 F.2d 1396 (2d Cir. 1974); *Black v. United States*, 534 F.2d 524 (2d Cir. 1976); *Buck v. Board of Elections of City of New York*, 536 F.2d 522 (2d Cir. 1976). Conclusory or vague complaints, limited to general allegations of deprivation, are insufficient "unless amplified by specific instances of misconduct." *Ostrer v. Aronwald*, 567 F.2d 551, 553 (2d Cir. 1977).

Ordinarily I might grant ACTWU leave to amend its complaint. However, under *Garmon* and *Lockridge, supra*, the NLRB has exclusive jurisdiction over the claims against Stevens. See n.10, *post*. No leave to amend will be granted.

■■■ ACTWU's fourth and fifth causes of action are based upon 42 U.S.C. §§ 1985 and 1986, respectively. Under the rule of *Griffin v. Breckenridge*, 403 U.S. 88, 102, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971), the action may be maintained under these sections only if plaintiff alleges "some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." The only animus alleged in the case at bar is that of an employer and its alleged co-conspirators against a union and its members, because of the union activities.[9] In *Moshlak v. American Broad-*

---

8. The statute provides:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

9. The fourth and fifth causes of action re-allege the allegations of ¶¶ 2–15 of the complaint. Paragraph 14(q) alleges, as certain of the acts complained of:

"Inciting and exploiting racial discord and tensions within textile plants and the communities where they are located with the intent, purpose and effect of (i) intimidating and harassing black employees who support ACTWU's organizational and representational activities and (ii) inciting white employees to oppose ACTWU's organizational and representational activities; . . ."
While there are references in this paragraph to the color of employees, the thrust of the claim is plainly that of unfair labor practices committed against employees of *both* races. Hence the invidiously discriminatory motivation against members of a *particular* race required by *Griffin v. Breckenridge* is not pleaded.

*casting Co.*, 423 F.Supp. 774, 778 (S.D.N.Y. 1976), Judge Lasker of this Court gave short shrift to a labor union's contention that its members fell within those particular, discriminated-against classes contemplated by the Supreme Court in *Griffin*, and so do I. See also *Bova v. Pipefitters & Plumbers Local 60*, 554 F.2d 226 (5th Cir. 1977).[10]

The sixth and final cause of action reiterates the alleged unlawful acts of Stevens in violation of the civil rights acts, and prays for injunctive relief. The third, fourth and fifth causes of action, invoking the civil rights acts, having fallen for the reasons stated,[11] the sixth cause of action falls with them.

## CONCLUSION

The Clerk of the Court is directed to enter judgment in favor of the defendant, dismissing the complaint with prejudice and without costs.

It is So Ordered.

---

10. *Moshlak* and *Bova* also hold that to the extent the employees have viable claims against their employers, they must be submitted to the NLRB. *Bova* at 228; *Moshlak* at 778. While these cases arose within the context of § 1985, their rationale is equally applicable to claims under § 1983. The civil rights acts may not be used to undermine the enforcement machinery devised by Congress for labor disputes.

11. By this I mean both the infirmities in the civil rights causes of action as pleaded, and the exclusive competence of the NLRB.